# EXHIBIT A

Electronically Filed
7/18/2018 1:22 PM
Third Judicial District, Canyon County
Chris Yamamoto, Clerk of the Court
By: Sharon Carter, Deputy Clerk

LOUIS V. SPIKER, ISB No. 8281
JANINE P. REYNARD, ISB No. 6030
WORST, FITZGERALD & STOVER, PLLC
3858 N. Garden Center Way, Suite 200
P.O. Box 1544
Boise, ID 83701
Telephone: 208-345-9100
Facsimile: 208-384-0442
Email: efile@magicvalleylaw.com
Attorney for Plaintiff

IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF

THE STATE OF IDAHO, IN AND FOR THE COUNTY OF CANYON

| | |
|---|---|
| RLI CORP. a/s/o Jack E. Crans,<br><br>     Plaintiff,<br><br>v.<br><br>THE GOODYEAR TIRE AND RUBBER COMPANY, a foreign corporation,<br><br>     Defendant. | CV14-18-07506<br>Case No. _____<br><br>SUMMONS<br><br>     Ford, Bradly S. |

**NOTICE:** **YOU HAVE BEEN SUED BY THE ABOVE NAMED PLAINTIFF.** THE COURT MAY ENTER JUDGMENT AGAINST YOU WITHOUT FURTHER NOTICE UNLESS YOU RESPOND WITHIN 21 DAYS. **READ THE INFORMATION BELOW.**

TO:  **THE GOODYEAR TIRE AND RUBBER COMPANY:**

You are hereby notified that in order to defend this lawsuit, an appropriate written response must be filed with the above designated court at 1115 Albany St., Caldwell, ID 83605, (208)454-7337 within 21 days after service of this Summons on you. If you fail to so respond the court may enter judgment against you as demanded by the plaintiff in the Complaint.

A copy of the Complaint is served with this Summons. If you wish to seek the advice or representation of an attorney in this matter, you should do so promptly so that your written

SUMMONS - 1

response, if any, may be filed in time and other legal rights protected.

An appropriate written response requires compliance with Rule 10(a)(1) and other Idaho Rules of Civil Procedure and shall also include:

1.  The title and number of this case.

2.  If your response is an Answer to the Complaint, it must contain admissions or denials of the separate allegations of the Complaint and other defenses you may claim.

3.  Your signature, mailing address and telephone number, or the signature, mailing address and telephone number of your attorney.

4.  Proof of mailing or delivery of a copy of your response to plaintiff's attorney, as designated above. To determine whether you must pay a filing fee with your response, contact the Clerk of the above-named court.

WITNESS My hand and the seal of said District Court this _____ day of 7/18/2018 1:22 PM , 2018.

CLERK OF THE COURT

By _____
    Deputy Clerk

SUMMONS - 2

Electronically Filed
Third Judicial District, Canyon County
Chris Yamamoto, Clerk of the Court
By: Sharon Carter, Deputy Clerk

LOUIS V. SPIKER, ISB No. 8281
JANINE P. REYNARD, ISB No. 6030
WORST, FITZGERALD & STOVER, PLLC
3858 N. Garden Center Way, Ste. 200
P.O. Box 1544
Boise, ID 83701
Telephone: 208-345-9100
Facsimile: 208-384-0442
Email: efile@magicvalleylaw.com
Attorney for Plaintiff

## IN THE DISTRICT COURT OF THE THIRD JUDICIAL DISTRICT OF

## THE STATE OF IDAHO, IN AND FOR THE COUNTY OF CANYON

| | |
|---|---|
| RLI CORP. a/s/o Jack E. Crans,<br><br>     Plaintiff,<br><br>v.<br><br>THE GOODYEAR TIRE & RUBBER<br>COMPANY, a foreign corporation,<br><br>     Defendant. | Case No. CV14-18-07506<br>_____<br><br>COMPLAINT<br><br>Category: A.A<br>Fee: $221.00 |

COMES NOW the Plaintiff above named and for cause of action against the Defendant, complains and alleges as follows:

### NATURE OF THE CLAIM

1.     Plaintiff RLI Corp. ("RLI"), as an insurer, has a subrogated interest under its policy of insurance issued to Jack E. Crans. ("Crans"), to recover monies paid to or on behalf of Crans for damages and personal injuries caused by the Defendant arising from a motor vehicle accident.

## JURISDICTION AND VENUE

2.      RLI realleges and herby incorporates the above paragraphs.

3.      RLI is authorized to do business in the state of Idaho under a certificate of authority issued by the Idaho Department of Insurance.

4.      Upon information and belief, Crans is now and at all times pertinent hereto was a resident of Canyon County, Idaho.

5.      The Goodyear Tire & Rubber Company ("Goodyear") is a foreign corporation engaged in the business of designing, manufacturing, distributing and/or selling tires, including a certain Goodyear G670RV, size 295/80R22.5, DOT Code DANU 2CAW 2911 (the "Tire").

6.      Jurisdiction and venue are proper in Canyon County pursuant to and by virtue of Idaho Code §§ 5-404 and 5-514.

7.      The amount in controversy exceeds the minimum jurisdictional requirements of this Court.

## FACTUAL ALLEGATIONS

8.      RLI realleges and herby incorporates the above paragraphs.

9.      The Tire was manufactured by Goodyear and sold into the chain of distribution wherein it was

10.     The Tire was ultimately affixed to a 2011 Monaco Holiday Rambler Sceptre Recreational Vehicle ("RV"), owned by Crans.

11.     Goodyear is a seller of goods specializing in the sale of recreational vehicle tires of the same kind as the Tire.

12.     Upon information and belief, Goodyear knew or had reason to know that the Tire would be affixed to a recreational vehicle.

13.     On July 19, 2016, Crans was driving the RV on Interstate 15 near Idaho Falls, Idaho. The Tire was affixed to the front right wheel position of the RV. Suddenly and without warning, the Tire's structural integrity failed.

14.     The Tire was defectively designed and/or manufactured, rendering it unreasonably dangerous for its intended uses and for any foreseeable uses or misuse at the time it was sold by Goodyear.

15.     The defective and unreasonably dangerous condition of the Tire caused the RV to become uncontrollable and strike an embankment.

16.     Crans and his passenger Roberta Radford suffered personal injury and property damage as a result of the incident caused by the defective and unreasonably dangerous condition of the Tire.

17.     When Goodyear manufactured and/or sold the Tire, it knew or should have known the Tire was defective and unreasonably dangerous for its ordinary uses, intended uses, and all other foreseeable uses and misuses and could suffer a tread separation.

18.     When Goodyear manufactured and/or sold the Tire, it knew or should have known that tread separation events can lead to loss of vehicle control.

19.     At all times relevant hereto, Goodyear knew or should have known that the defective condition of the Tire created foreseeable and unreasonable risk of harm, including the likelihood of serious injury and death to those occupying vehicles to which such tires are affixed.

20.     At all times relevant hereto, reasonable alternative designs and processes of manufacture and testing, that were economically and technologically feasible, existed within the Tire industry and were within the actual and constructive knowledge and control of Goodyear.

21.     Crans did not know about, and had no reason to know about, the defective and

COMPLAINT – Page 3

unreasonably dangerous condition of the Tire.

## COUNT I
## (NEGLIGENCE)

22.     RLI realleges and hereby incorporates the above paragraphs.

23.     At all relevant times, Goodyear owed Crans the duty to manufacture, assemble, inspect and/or test its tires, including the subject Tire described above, in such a manner and with the exercise of reasonable care, so as to prevent the tread and steel belt on the Tire from separating from the Tire, thereby causing a hazard and danger for any user of the tire, before selling the Tire and placing the subject tire into the stream of commerce.  To the extent Goodyear did not owe this duty under existing Idaho law, they assumed such a duty by virtue of its conduct.

24.     At all relevant times, Goodyear owed a duty to warn consumers and/or intended users of the Tire, including Crans, of known or suspected defects that rendered the subject Tire unreasonably dangerous to use. Upon information and belief, Goodyear knew or had reason to know that the Tire posed an unreasonable risk of harm by virtue of informal and formal claims arising from substantially similar incidents, internal testing and research, and other sources of information to be developed in discovery.  To the extent Goodyear did not owe this duty under the existing Idaho law, it assumed such a duty by virtue of its conduct.

25.     Goodyear breached the above-cited duties in various ways, including but not limited to, one or more of the following negligent acts:

> a.      By failing to use due care in designing, manufacturing, testing, and/or inspecting the Tire for its intended use and all reasonably foreseeably uses and misuses, and, specifically, relating to the defective, hazardous and

unreasonably dangerous conditions regarding the Tire's propensity to fail.

b.    By negligently designing, constructing and/or manufacturing the Tire;

c.    By failing to make reasonable tests and/or inspections to discover the defective, hazardous and unreasonable dangerous conditions relating to the Tire's propensity to fail;

d.    By negligently failing to warn users of the Tire, including Crans, of said defective, hazardous and unreasonably dangerous conditions relating to tire tread/belt separation which it knew or should have known through the exercise of ordinary care;

e.    By failing to discover the defective, hazardous and unreasonably dangerous conditions relating to the Tire's propensity to sustain, unexpected tread – belt separations, while in the possession of Goodyear, and during which times employees, servants or agents of Gooding had an opportunity to inspect, service and work on the subject tire;

f.    By failing to warn users about tire aging, tire degrading, oxidation and ozonation which occur as a tire ages and makes the tire more likely to fail during normal use, including an increased likeliness to experience a tire tread/belt separation as a result of aging when it knew or should have known through the exercise of ordinary care of such a danger;

g.    By failing to place a warning about age or expiration date on the subject tire which could be easily understood by a consumer, instead of relying on the cryptic and secretive coding in the tire's Department of Transportation number coding;

h.     By negligently failing to design and manufacture a tire that was robust enough for its intended use; and

i.     Other negligent acts and omissions to be developed in the course of discovery.

26.     Goodyear knew or should have known that exposing users to the dangerous and defective and hazardous condition existing in the Tire would give rise to bodily injuries and property damage to such users.

27.     The Tire's defective condition was latent and Crans was not capable or realizing the dangerous condition and could not have discovered the dangerous condition even upon performing a reasonable inspection of the same.

28.     Goodyear's negligence directly and proximately caused the July 19, 2016 accident and Crans and his passenger, Roberta Radford's injuries and property damage alleged herein.

29.     As a direct and proximate result of the negligence set forth in this Count, Crans and Ranford were damaged in amount to be determined at trial, but which exceed the jurisdictional requirement of this Court.

## COUNT II
### (SUBROGATION)

30.     RLI realleges and herby incorporates the above paragraphs.

31.     RLI, as the subrogee to its insured Crans, asserts its statutory, contractual, and common law subrogation rights to be reimbursed for the payments that it has made for the benefit of its insured Crans under the insurance policy that it issued to Crans.

32.     As subrogee RLI made the payments to Crans or on his behalf for the property and personal injuries caused by Goodyear, and for which Goodyear is primarily liable.

33.     RLI made the payments to protect its own interests, and not as a volunteer.

34.     The losses for which RLI has made the payments is not one for which RLI is primarily liable.

35.     RLI made the payments pursuant to the insurance policy it issued to its insured Crans.

36.     RLI's insured Crans, as the injured party, has an assignable cause of action against Goodyear, which the insured Crans could have asserted on his own benefit had he not been fully compensated for his property damage by RLI.

37.     RLI has suffered damages that have been cause by the acts or omissions upon which the liability of Goodyear in this action is based.

### ATTORNEY FEES AND COSTS

38.     RLI realleges and hereby incorporates the above paragraphs.

39.     RLI has been required to retain the services of counsel and has retained the firm of Worst, Fitzgerald & Stover, PLLC to prosecute this action.

40.     RLI is entitled to an award of reasonable attorney fees and costs pursuant to Idaho Code Sections 12-120(1), 12-121 and other applicable law.

41.     A reasonable attorney fee, in the event judgment is entered by default, is the sum of $5,000.00.

WHEREFORE, Plaintiff prays for judgment against the Defendant as follows:

1.      For an award of damages as are reasonable in the premises;

2.      For Plaintiff's reasonable attorney's fees incurred herein pursuant to Idaho Code Sections 12-120(1), 12-121 and other applicable law, in the amount of $5,000.00, in the event judgment is entered by default.

3.  For Plaintiff's costs incurred herein; and,

4.  For such other and further relief as to the Court may appear just.

DATED this ___18th___ day of ___July___, 2018.

WORST, FITZGERALD & STOVER, PLLC

By _____
LOUIS V. SPIKER
Attorney for Plaintiff

COMPLAINT – Page 8

**EXHIBIT B**



**AST / PERINJ**
**Transmittal Number: 18461611**
**Date Processed: 07/20/2018**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Paula B Christ<br>The Goodyear Tire & Rubber Company<br>200 Innovation Way<br>Akron, OH 44316-0001 |

| | |
|---|---|
| **Entity:** | The Goodyear Tire & Rubber Company<br>Entity ID Number  2385176 |
| **Entity Served:** | The Goodyear Tire and Rubber Company |
| **Title of Action:** | Rli Corp, A/s/o Jack E. Crans vs. The Goodyear Tire and Rubber Company |
| **Document(s) Type:** | Summons/Complaint |
| **Nature of Action:** | Product Liability |
| **Court/Agency:** | Canyon County District Court, Idaho |
| **Case/Reference No:** | CV14-18-07506 |
| **Jurisdiction Served:** | Idaho |
| **Date Served on CSC:** | 07/20/2018 |
| **Answer or Appearance Due:** | 21 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Personal Service |
| Sender Information: | Louis V. Spiker<br>208-345-9100 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

# EXHIBIT C

# Section 1: 10-Q (10-Q)

Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 10-Q

**(Mark One)**

☒     **Quarterly Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the quarterly period ended June 30, 2018**

**or**

☐     **Transition Report Pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934**

**For the transition period from           to**

**Commission File Number:   001-09463**

# RLI Corp.
(Exact name of registrant as specified in its charter)

| **Delaware** | **37-0889946** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **9025 North Lindbergh Drive, Peoria, IL** | **61615** |
| (Address of principal executive offices) | (Zip Code) |

**(309) 692-1000**
(Registrant's telephone number, including area code)

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.   Yes ☒   No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Web site, if any, every Interactive Data File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files).   Yes ☒   No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company.  See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer ☒ | Accelerated filer ☐ |
|---|---|
| Non-accelerated filer ☐ (Do not check if a smaller reporting company) | Smaller reporting company ☐ |
| | Emerging growth company ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐   No ☒

APPLICABLE ONLY TO CORPORATE ISSUERS:

As of July 13, 2018, the number of shares outstanding of the registrant's Common Stock was 44,339,939.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| Part I - Financial Information |  |  | 3 |
|  | Item 1. | Financial Statements | 3 |
|  |  | Condensed Consolidated Statements of Earnings and Comprehensive Earnings For the Three and Six-Month Periods Ended June 30, 2018 and 2017 (unaudited) | 3 |
|  |  | Condensed Consolidated Balance Sheets as of June 30, 2018 (unaudited) and December 31, 2017 | 4 |
|  |  | Condensed Consolidated Statements of Cash Flows For the Six-Month Periods Ended June 30, 2018 and 2017 (unaudited) | 5 |
|  |  | Notes to unaudited condensed consolidated interim financial statements | 6 |
|  | Item 2. | Management's discussion and analysis of financial condition and results of operations | 22 |
|  | Item 3. | Quantitative and qualitative disclosures about market risk | 36 |
|  | Item 4. | Controls and procedures | 36 |
| Part II - Other Information |  |  | 36 |
|  | Item 1. | Legal proceedings | 36 |
|  | Item 1a. | Risk factors | 36 |
|  | Item 2. | Unregistered sales of equity securities and use of proceeds | 36 |
|  | Item 3. | Defaults upon senior securities | 36 |
|  | Item 4. | Mine safety disclosures | 37 |
|  | Item 5. | Other information | 37 |
|  | Item 6. | Exhibits | 37 |
| Signatures |  |  | 38 |

PART I - FINANCIAL INFORMATION

**Item 1. Financial Statements**

RLI Corp. and Subsidiaries
Condensed Consolidated Statements of Earnings and Comprehensive Earnings
(Unaudited)

| (in thousands, except per share data) | For the Three-Month Periods Ended June 30, 2018 | 2017 | For the Six-Month Periods Ended June 30, 2018 | 2017 |
|---|---|---|---|---|
| Net premiums earned | $ 196,522 | $ 184,331 | $ 386,549 | $ 367,616 |
| Net investment income | 14,577 | 13,238 | 28,809 | 26,243 |
| Net realized gains (losses) | 20,849 | (1,359) | 29,309 | 1,355 |
| Other-than-temporary impairment (OTTI) losses on investments | - | - | (56) | (2,090) |
| Net unrealized losses on equity securities | (12,611) | - | (39,383) | - |
| Consolidated revenue | $ 219,337 | $ 196,210 | $ 405,228 | $ 393,124 |
| Losses and settlement expenses | 101,653 | 90,347 | 194,074 | 183,737 |
| Policy acquisition costs | 66,325 | 60,695 | 133,059 | 124,198 |
| Insurance operating expenses | 14,398 | 13,546 | 27,783 | 26,881 |
| Interest expense on debt | 1,858 | 1,857 | 3,714 | 3,713 |
| General corporate expenses | 2,641 | 2,535 | 4,924 | 5,860 |
| Total expenses | $ 186,875 | $ 168,980 | $ 363,554 | $ 344,389 |
| Equity in earnings of unconsolidated investees | 7,100 | 6,806 | 12,266 | 11,744 |
| Earnings before income taxes | $ 39,562 | $ 34,036 | $ 53,940 | $ 60,479 |
| Income tax expense | 6,311 | 7,828 | 8,473 | 14,443 |
| Net earnings | $ 33,251 | $ 26,208 | $ 45,467 | $ 46,036 |
| | | | | |
| Other comprehensive earnings (loss), net of tax | (7,675) | 10,599 | (34,073) | 22,368 |
| Comprehensive earnings | $ 25,576 | $ 36,807 | $ 11,394 | $ 68,404 |
| | | | | |
| Earnings per share: | | | | |
| Basic: | | | | |
| Basic net earnings per share | $ 0.75 | $ 0.60 | $ 1.03 | $ 1.05 |
| Basic comprehensive earnings per share | $ 0.58 | $ 0.84 | $ 0.26 | $ 1.56 |
| | | | | |
| Diluted: | | | | |
| Diluted net earnings per share | $ 0.74 | $ 0.59 | $ 1.01 | $ 1.03 |
| Diluted comprehensive earnings per share | $ 0.57 | $ 0.83 | $ 0.25 | $ 1.54 |
| | | | | |
| Weighted average number of common shares outstanding: | | | | |
| Basic | 44,310 | 44,005 | 44,266 | 43,983 |
| Diluted | 44,742 | 44,519 | 44,853 | 44,517 |
| | | | | |
| Cash dividends paid per common share | $ 0.22 | $ 0.21 | $ 0.43 | $ 0.41 |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

3

RLI Corp. and Subsidiaries
Condensed Consolidated Balance Sheets
(Unaudited)

| (in thousands, except share data) | June 30, 2018 | December 31, 2017 |
|---|---|---|
| **ASSETS** | | |
| Investments and cash: | | |
| Fixed income: | | |
| Available-for-sale, at fair value (amortized cost - $1,727,075 at 6/30/18 and $1,646,411 at 12/31/17) | $ 1,710,612 | $ 1,672,239 |
| Equity securities, at fair value (cost - $207,214 at 6/30/18 and $182,002 at 12/31/17) | 386,603 | 400,492 |
| Short-term investments, at cost which approximates fair value | - | 9,980 |
| Other invested assets | 36,562 | 33,808 |
| Cash | 34,102 | 24,271 |
| Total investments and cash | $ 2,167,879 | $ 2,140,790 |
| Accrued investment income | 14,473 | 15,166 |
| Premiums and reinsurance balances receivable, net of allowances for uncollectible amounts of $16,933 at 6/30/18 and $16,935 at 12/31/17 | 143,442 | 134,351 |
| Ceded unearned premium | 65,007 | 57,928 |
| Reinsurance balances recoverable on unpaid losses and settlement expenses, net of allowances for uncollectible amounts of $10,005 at 6/30/18 and $10,014 at 12/31/17 | 315,117 | 301,991 |
| Deferred policy acquisition costs | 83,624 | 77,716 |
| Property and equipment, at cost, net of accumulated depreciation of $51,026 at 6/30/18 and $47,676 at 12/31/17 | 56,019 | 55,849 |
| Investment in unconsolidated investees | 91,594 | 90,067 |
| Goodwill and intangibles | 54,693 | 59,302 |
| Other assets | 15,957 | 14,084 |
| TOTAL ASSETS | $ 3,007,805 | $ 2,947,244 |
| | | |
| **LIABILITIES AND SHAREHOLDERS' EQUITY** | | |
| Liabilities | | |
| Unpaid losses and settlement expenses | $ 1,343,248 | $ 1,271,503 |
| Unearned premiums | 482,156 | 451,549 |
| Reinsurance balances payable | 18,938 | 21,624 |
| Funds held | 68,795 | 74,560 |
| Income taxes-deferred | 36,432 | 53,768 |
| Bonds payable, long-term debt | 149,022 | 148,928 |
| Accrued expenses | 38,384 | 52,848 |
| Other liabilities | 21,033 | 18,966 |
| TOTAL LIABILITIES | $ 2,158,008 | $ 2,093,646 |
| | | |
| Shareholders' Equity | | |
| Common stock ($0.01 par value at 6/30/18 and $1.00 par value at 12/31/17) | | |
| (100,000,000 shares authorized at 6/30/18 and 12/31/17) | | |
| (67,270,153 shares issued, 44,339,939 shares outstanding at 6/30/18) | | |
| (67,078,569 shares issued, 44,148,355 shares outstanding at 12/31/17) | $      673 | $    67,079 |
| Paid-in capital | 303,245 | 233,077 |
| Accumulated other comprehensive earnings | (14,648) | 157,919 |
| Retained earnings | 953,526 | 788,522 |
| Deferred compensation | 7,936 | 8,640 |
| Less: Treasury shares at cost | | |
| (22,930,214 shares at 6/30/18 and 12/31/17) | (400,935) | (401,639) |
| TOTAL SHAREHOLDERS' EQUITY | $   849,797 | $   853,598 |
| TOTAL LIABILITIES AND SHAREHOLDERS' EQUITY | $ 3,007,805 | $ 2,947,244 |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

RLI Corp. and Subsidiaries
Condensed Consolidated Statements of Cash Flows
(Unaudited)

| (in thousands) | For the Six-Month Periods Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | | 2017 | |
| Net cash provided by operating activities | $ | 100,000 | $ | 74,570 |
| Cash Flows from Investing Activities | | | | |
| Investments purchased | $ | (431,061) | $ | (207,963) |
| Investments sold | | 282,276 | | 110,679 |
| Investments called or matured | | 67,493 | | 56,501 |
| Net change in short-term investments | | 9,980 | | (10,995) |
| Net property and equipment purchased | | (3,638) | | (5,372) |
| Other | | 62 | | (92) |
| Net cash used in investing activities | $ | (74,888) | $ | (57,242) |
| Cash Flows from Financing Activities | | | | |
| Cash dividends paid | $ | (19,043) | $ | (18,036) |
| Stock plan share issuance | | 3,762 | | 3,794 |
| Net cash used in financing activities | $ | (15,281) | $ | (14,242) |
| Net increase in cash | $ | 9,831 | $ | 3,086 |
| Cash at the beginning of the period | $ | 24,271 | $ | 18,269 |
| Cash at June 30 | $ | 34,102 | $ | 21,355 |

See accompanying notes to the unaudited condensed consolidated interim financial statements.

5

**NOTES TO UNAUDITED CONDENSED CONSOLIDATED INTERIM FINANCIAL STATEMENTS**

**1.  SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

A.  DESCRIPTION OF BUSINESS

RLI Corp. (the "Company") is an insurance holding company that was organized in 1965. On May 4, 2018, RLI Corp. changed its state of incorporation from the State of Illinois to the State of Delaware (the "Reincorporation"). The Reincorporation was effected by merging RLI Corp., an Illinois corporation ("RLI Illinois") into RLI Corp., a Delaware corporation ("RLI Delaware"). The separate corporate existence of RLI Illinois ceased and RLI Delaware continues in existence as the surviving corporation and possesses all rights, privileges, powers and franchises of RLI Illinois. The Reincorporation did not result in any change in the name, business, management, fiscal year, location of the principal executive offices, assets or liabilities of the Company. Each outstanding share of RLI Illinois common stock, which had a par value of $1.00 per share, was automatically converted into one outstanding share of RLI Delaware common stock, with a par value of $0.01 per share. In order to reflect the new par value of common stock on the balance sheet, a $66.6 million reclassification from common stock to paid-in-capital was made during the second quarter. For more information on the Reincorporation, see RLI Corp.'s Form 8-K filed on May 7, 2018.

B.  BASIS OF PRESENTATION

The unaudited condensed consolidated interim financial statements have been prepared in accordance with generally accepted accounting principles in the United States of America (GAAP) for interim financial reporting and with the instructions to Form 10-Q and Regulation S-X. Accordingly, they do not include all of the disclosures required by GAAP for complete financial statements. As such, these unaudited condensed consolidated interim financial statements should be read in conjunction with our 2017 Annual Report on Form 10-K. Management believes that the disclosures are adequate to make the information presented not misleading, and all normal and recurring adjustments necessary to present fairly the financial position at June 30, 2018 and the results of operations of RLI Corp. and subsidiaries for all periods presented have been made. The results of operations for any interim period are not necessarily indicative of the operating results for a full year. Certain reclassifications were made to 2017 to conform to the classifications used in the current year.

The preparation of the unaudited condensed consolidated interim financial statements requires management to make estimates and assumptions relating to the reported amounts of assets and liabilities, the disclosure of contingent assets and liabilities at the date of the unaudited condensed consolidated interim financial statements and the reported amounts of revenue and expenses during the period. These estimates are inherently subject to change and actual results could differ significantly from these estimates.

C.  ADOPTED ACCOUNTING STANDARDS

*ASU 2014-09, Revenue from Contracts with Customers (Topic 606)*

ASU 2014-09 was issued to clarify and remove inconsistencies within revenue recognition requirements. The core principle of the update is that an entity should recognize revenue to depict the transfer of promised goods or services to customers in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. To achieve that core principle, the transaction price for a contract is allocated among separately identifiable performance obligations and a portion of the transaction price is recognized as revenue when the associated performance obligation has been completed or transferred to the customer. All contracts and fulfillment activities within the scope of Topic 944, Financial Services – Insurance, investment income, investment related gains and losses and equity in earnings of unconsolidated investees are outside the scope of this ASU.

We adopted ASU 2014-09 on January 1, 2018. However, nearly all (over 99 percent) of our consolidated revenue is scoped out and therefore exempt from the guidance contained within this ASU. For the remaining portion, the revenue recognition policy we utilize aligns with the new guidance and there were no changes to the way we recognize revenue. Although the recognition of earnings from equity method investees is out of scope from the update, the recognition of revenue by our equity method investees would be subject to the new guidance if the revenue streams are within this update's scope. Any impact on revenues would affect the net income of each of the equity method investees, upon which we calculate our portion of earnings to recognize. Our equity method investees are private companies and this guidance becomes effective for private companies in periods beginning after December 15, 2018. As a result, their earnings and our portion of those earnings

are not impacted in 2018. We expect that revenue generated by both of our equity method investees will either be outside the scope of this update or largely unaffected by the changes.

*ASU 2016-01, Financial Instruments - Overall (Subtopic 825-10): Recognition and Measurement of Financial Assets and Financial Liabilities*

This ASU was issued to improve the recognition and measurement of financial instruments. The new guidance makes targeted improvements to GAAP as follows:
   a.  Requires equity investments (except those accounted for under the equity method of accounting or those that result in consolidation of the investee) to be measured at fair value with changes in fair value recognized in net earnings;
   b.  Simplifies the impairment assessment of equity investments without readily determinable fair values by requiring a qualitative assessment to identify impairment;
   c.  Eliminates the requirement for public business entities to disclose the method(s) and significant assumptions used to estimate the fair value that is required to be disclosed for financial instruments measured at amortized cost on the balance sheet;
   d.  Requires public business entities to use the exit price notion when measuring the fair value of financial instruments for disclosure purposes;
   e.  Requires an entity to present separately in other comprehensive earnings the portion of the total change in the fair value of a liability resulting from a change in the instrument-specific credit risk when the entity has elected to measure the liability at fair value in accordance with the fair value option for financial instruments;
   f.  Requires separate presentation of financial assets and financial liabilities by measurement category and form of financial asset on the balance sheet or the accompanying notes to the financial statements; and
   g.  Clarifies that an entity should evaluate the need for a valuation allowance on a deferred tax asset related to available-for-sale securities in combination with the entity's other deferred tax assets.

We adopted ASU 2016-01 on January 1, 2018. A cumulative-effect adjustment to the balance sheet was made as of the beginning of the year, which moved $142.2 million of net unrealized gains and losses on equity securities from accumulated other comprehensive earnings to retained earnings. During the first six months of 2018, we recognized $39.4 million of unrealized losses on equity securities within net earnings and $8.3 million of income tax benefit. This compares to $8.5 million of unrealized gains on equity securities, net of tax, that was recognized through other comprehensive earnings for the comparable period in 2017. The future impact to our net earnings will vary depending upon the level of volatility in the performance of the securities held in our equity portfolio and the overall market.

*ASU 2016-15, Statement of Cash Flows (Topic 230):  Classification of Certain Cash Receipts and Cash Payments*

ASU 2016-15 was issued to reduce the diversity in practice of how certain cash receipts and payments, for which current guidance is silent, are classified in the statement of cash flows. The update addresses eight specific issues, including contingent consideration payments made after a business combination, distributions received from equity method investees and the classification of cash receipts and payments that have aspects of more than one class of cash flows. We adopted ASU 2016-15 on January 1, 2018. The adoption did not have a material impact on our statement of cash flows.

*ASU 2018-02, Income Statement - Reporting Comprehensive Income (Topic 220): Reclassification of Certain Tax Effects from Accumulated Other Comprehensive Income*

ASU 2018-02 was issued as a result of the enactment of the Tax Cuts and Jobs Act of 2017 (TCJA) on December 22, 2017. Accounting guidance required deferred tax items to be revalued based on the new tax laws (the most significant of which reduced the corporate tax rate to 21 percent from 35 percent) with the change included in income from continuing operations. Since other comprehensive income was not affected by the revaluation of the deferred tax items, the net accumulated other comprehensive income (AOCI) balance was reflective of the historic 35 percent tax rate instead of the newly enacted rate, a difference that is referred to as a stranded tax effect. This ASU allows for the option to reclassify the stranded tax effects resulting from the implementation of the TCJA out of AOCI and into retained earnings. ASU 2018-02 does not replace the guidance requiring changes from the enactment of other tax laws or rates to be included within income from continuing operations and is applicable only to changes from the TCJA.

We adopted ASU 2018-02 during the first quarter of 2018. A current period adjustment was made to the balance sheet, which moved $3.7 million of stranded tax effects on the unrealized balances of our fixed income securities and equity method investees from accumulated other comprehensive earnings to retained earnings. The entire unrealized balance on equity securities was reclassified from AOCI into retained earnings from the adoption of ASU 2016-01 on January 1, 2018 and was

Table of Contents

therefore unaffected by this ASU. As there was no impact to net earnings and the balance sheet effect is limited to a reclassification within the equity section, there was not a material impact on our financial statements.

D.  PROSPECTIVE ACCOUNTING STANDARDS

*ASU 2016-02, Leases (Topic 842)*

ASU 2016-02 was issued to improve the financial reporting of leasing transactions. Under current guidance for lessees, leases are only included on the balance sheet if certain criteria, classifying the agreement as a capital lease, are met. This update will require the recognition of a right-of-use asset and a corresponding lease liability, discounted to the present value, for all leases that extend beyond 12 months. For operating leases, the asset and liability will be expensed over the lease term on a straight-line basis, with all cash flows included in the operating section of the statement of cash flows. For finance leases, interest on the lease liability will be recognized separately from the amortization of the right-of-use asset in the statement of comprehensive income and the repayment of the principal portion of the lease liability will be classified as a financing activity while the interest component will be included in the operating section of the statement of cash flows.

This ASU is effective for annual and interim reporting periods beginning after December 15, 2018. Early adoption is permitted. Upon adoption, leases will be recognized and measured at the beginning of the earliest period presented using a modified retrospective approach. We do not have any financing leases. Approximately $31 million of undiscounted future lease liabilities would have to be discounted to present value and added to our balance sheet with a corresponding right-of-use asset if the guidance were applicable on June 30, 2018. We have approximately $7 million of annual operating lease expenses and do not expect that there will be a materially different annual rental expense upon adoption.

*ASU 2016-13, Financial Instruments – Credit Losses (Topic 326)*

ASU 2016-13 was issued to provide more decision-useful information about the expected credit losses on financial instruments. Current GAAP delays the recognition of credit losses until it is probable a loss has been incurred. The update will require a financial asset measured at amortized cost, including reinsurance balances recoverable, to be presented at the net amount expected to be collected by means of an allowance for credit losses that runs through net earnings. Credit losses relating to available-for-sale debt securities will also be recorded through an allowance for credit losses. However, the amendments would limit the amount of the allowance to the amount by which fair value is below amortized cost. The measurement of credit losses on available-for-sale securities is similar under current GAAP, but the update requires the use of the allowance account through which amounts can be reversed, rather than through an irreversible write-down.

This ASU is effective for annual and interim reporting periods beginning after December 15, 2019. Early adoption is permitted beginning after December 15, 2018. Upon adoption, the update will be applied using the modified-retrospective approach, by which a cumulative-effect adjustment will be made to retained earnings as of the beginning of the first reporting period presented. We do not have any assets measured at amortized cost that would be impacted by this accounting standards update. Additionally, as our fixed income portfolio is weighted towards higher rated bonds (82.5 percent rated A or better at June 30, 2018) and we purchase reinsurance from financially strong reinsurers, we do not expect that credit loss will be material.

*ASU 2018-07, Compensation-Stock Compensation (Topic 718):  Improvements to Nonemployee Share-Based Payment Accounting*

ASU 2018-07 was issued to simplify the accounting for share-based transactions by expanding the scope of Topic 718 from only being applicable to share-based payments to employees to also include share-based payment transactions for acquiring goods and services from nonemployees. As a result, nonemployee share-based transactions will be measured by estimating the fair value of the equity instruments at the grant date, taking into consideration the probability of satisfying performance conditions. This ASU is effective for annual and interim reporting periods beginning after December 15, 2018. Early adoption is permitted. Our long term incentive plan limits the awards of share-based payments to employees and directors of the Company or any affiliate. The share-based compensation expense to nonemployee directors was less than $0.1 million in the first six months of 2018. Costs associated with such payments are not expected to materially increase and we do not expect this update to have a material impact on our financial statements.

E.  INTANGIBLE ASSETS

Goodwill and intangible assets totaled $54.7 million and $59.3 million at June 30, 2018 and December 31, 2017, respectively, as detailed in the following table.

| Goodwill and Intangible Assets (in thousands) | | June 30, 2018 | | December 31, 2017 |
|---|---|---|---|---|
| **Goodwill** | | | | |
| Energy surety | $ | 25,706 | $ | 25,706 |
| Miscellaneous and contract surety | | 15,110 | | 15,110 |
| Small commercial | | 5,246 | | 5,246 |
| Medical professional liability * | | - | | 3,595 |
| **Total goodwill** | $ | 46,062 | $ | 49,657 |
| | | | | |
| **Intangibles** | | | | |
| State insurance licenses | $ | 7,500 | $ | 7,500 |
| Definite-lived intangibles, net of accumulated amortization of $2,862 at 6/30/18 and $5,678 at 12/31/17 | | 1,131 | | 2,145 |
| **Total intangibles** | $ | 8,631 | $ | 9,645 |
| | | | | |
| **Total goodwill and intangibles** | $ | 54,693 | $ | 59,302 |

*  The medical professional liability goodwill balance reflects a cumulative non-cash impairment charge of $12.4 million and $8.8 million as of June 30, 2018 and December 31, 2017, respectively.

All definite-lived intangible assets are amortized against future operating results based on their estimated useful lives. Amortization of intangible assets was $0.1 million for the second quarter of 2018 and $0.2 million for the six-month period ended June 30, 2018, compared to $0.2 million for the second quarter of 2017 and $0.4 million for the six-month period ended June 30, 2017.

Annual impairment testing was performed on our energy surety goodwill, miscellaneous and contract surety goodwill, small commercial goodwill and state insurance license indefinite-lived intangible asset during the second quarter of 2018. Based upon these reviews, none of the assets were impaired. In addition, as of June 30, 2018, there were no triggering events that would suggest an updated review was necessary on the above mentioned goodwill and intangible assets.

As previously disclosed, adverse loss experience triggered the need to test the medical professional liability reporting unit during the first quarter of 2018 and the second quarter of 2017. The testing resulted in a $4.4 million non-cash impairment charge in 2018 and a $3.4 million non-cash impairment charge in 2017. In each instance, a fair value for the medical professional liability reporting unit's agency relationships, carried as a definite-lived intangible, was determined by using a discounted cash flow valuation. In 2018, the carrying value exceeded the fair value, resulting in a $0.8 million non-cash impairment charge.  In 2017, the resulting non-cash impairment charge on definite-lived intangibles was $1.8 million. A fair value for the medical professional liability reporting unit's goodwill was determined by using a weighted average of a market approach and discounted cash flow valuation. The carrying value exceeded the fair value in each year, resulting in a $3.6 million non-cash impairment charge in the first quarter of 2018 and a $1.6 million non-cash impairment charge during the second quarter of 2017. Subsequent to the first quarter 2018 impairment, the medical professional liability reporting unit had no remaining goodwill or intangible assets. All impairment charges were recorded as net realized losses in the respective period's consolidated statement of earnings.

F.  EARNINGS PER SHARE

Basic earnings per share (EPS) excludes dilution and is computed by dividing income available to common shareholders by the weighted-average number of common shares outstanding for the period. Diluted EPS reflects the dilution that could occur if securities or other contracts to issue common stock or common stock equivalents were exercised or converted into common stock. When inclusion of common stock equivalents increases the earnings per share or reduces the loss per share, the effect on earnings is anti-dilutive. Under these circumstances, the diluted net earnings or net loss per share is computed

excluding the common stock equivalents. The following represents a reconciliation of the numerator and denominator of the basic and diluted EPS computations contained in the unaudited condensed consolidated interim financial statements.

| (in thousands, except per share data) | For the Three-Month Period Ended June 30, 2018 | | | For the Three-Month Period Ended June 30, 2017 | | |
|---|---|---|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Basic EPS** | | | | | | |
| Income available to common shareholders | $ 33,251 | 44,310 | $ 0.75 | $ 26,208 | 44,005 | $ 0.60 |
| **Effect of Dilutive Securities** | | | | | | |
| Stock options | - | 432 | | - | 514 | |
| **Diluted EPS** | | | | | | |
| Income available to common shareholders | $ 33,251 | 44,742 | $ 0.74 | $ 26,208 | 44,519 | $ 0.59 |

| (in thousands, except per share data) | For the Six-Month Period Ended June 30, 2018 | | | For the Six-Month Period Ended June 30, 2017 | | |
|---|---|---|---|---|---|---|
| | Income (Numerator) | Shares (Denominator) | Per Share Amount | Income (Numerator) | Shares (Denominator) | Per Share Amount |
| **Basic EPS** | | | | | | |
| Income available to common shareholders | $ 45,467 | 44,266 | $ 1.03 | $ 46,036 | 43,983 | $ 1.05 |
| **Effect of Dilutive Securities** | | | | | | |
| Stock options | - | 587 | | - | 534 | |
| **Diluted EPS** | | | | | | |
| Income available to common shareholders | $ 45,467 | 44,853 | $ 1.01 | $ 46,036 | 44,517 | $ 1.03 |

G.  COMPREHENSIVE EARNINGS

Our comprehensive earnings include net earnings plus after-tax unrealized gains and losses on our fixed income portfolio in 2018. In 2017, after-tax unrealized gains and losses on our equity portfolio were also included. With the adoption of ASU 2016-01 on January 1, 2018, we began recognizing unrealized gains and losses on the equity portfolio through net income. See note 1.C to the unaudited condensed consolidated interim financial statements for more information. In reporting comprehensive earnings on a net basis in the statement of earnings, we used the federal statutory tax rate of 21 percent in 2018 and 35 percent in 2017.

Unrealized losses, net of tax, on the fixed income portfolio for the first six months of 2018 were $34.1 million, compared to $22.4 million of unrealized gains, net of tax, on the fixed income and equity portfolios during the same period last year. Unrealized losses in the first half of 2018 were attributable to rising interest rates, which decreased the fair value of securities held in the fixed income portfolio. In 2017, unrealized gains were primarily the result of increases in the fixed income portfolio due to slight declines in interest rates, though positive pricing movements in equity securities also contributed.

The following table illustrates the changes in the balance of each component of accumulated other comprehensive earnings for each period presented in the unaudited condensed consolidated interim financial statements. The 2017 activity and balances include the net unrealized gain and loss activity on both fixed income and equity securities, while the 2018 activity and ending balance reflect only the net unrealized gain and loss activity on fixed income securities due to the aforementioned adoption of ASU 2016-01.

10

| (in thousands) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | For the Three-Month Periods Ended June 30, | | | | For the Six-Month Periods Ended June 30, | | |
| Unrealized Gains/Losses on Available-for-Sale Securities | | 2018 | | 2017 | | 2018 | | 2017 |
| Beginning balance | $ | (6,973) | $ | 134,379 | $ | 157,919 | $ | 122,610 |
| Cumulative effect adjustment of ASU 2016-01 | | - | | - | | (142,219) | | - |
| Adjusted beginning balance | $ | (6,973) | $ | 134,379 | $ | 15,700 | $ | 122,610 |
| Other comprehensive earnings before reclassifications | | (8,385) | | 11,753 | | (34,795) | | 23,925 |
| Amounts reclassified from accumulated other comprehensive earnings | | 710 | | (1,154) | | 722 | | (1,557) |
| Net current-period other comprehensive earnings (loss) | $ | (7,675) | $ | 10,599 | $ | (34,073) | $ | 22,368 |
| Reclassification of stranded tax effect per ASU 2018-02 | | - | | - | | 3,725 | | - |
| Ending balance | $ | (14,648) | $ | 144,978 | $ | (14,648) | $ | 144,978 |

The sale or other-than-temporary impairment of an available-for-sale security results in amounts being reclassified from accumulated other comprehensive earnings to current period net earnings. The effects of reclassifications out of accumulated other comprehensive earnings by the respective line items of net earnings are presented in the following table. As previously mentioned, 2018 activity is reflective of activity on fixed income securities classified as available-for-sale, while 2017 also includes activity from the equity portfolio.

| (in thousands) | | | | | | Amount Reclassified from Accumulated Other Comprehensive Earnings | |
|---|---|---|---|---|---|---|---|
| | | For the Three-Month Periods Ended June 30, | | For the Six-Month Periods Ended June 30, | | | |
| Component of Accumulated Other Comprehensive Earnings | | 2018 | 2017 | 2018 | 2017 | | Affected line item in the Statement of Earnings |
| Unrealized gains and losses on available-for-sale securities | $ | (899) | $ 1,775 | $ (858) | $ 4,485 | | Net realized gains (losses) |
| | | - | - | (56) | (2,090) | | Other-than-temporary impairment (OTTI) losses on investments |
| | $ | (899) | $ 1,775 | $ (914) | $ 2,395 | | Earnings before income taxes |
| | | 189 | (621) | 192 | (838) | | Income tax expense |
| | $ | (710) | $ 1,154 | $ (722) | $ 1,557 | | Net earnings |

## 2.   INVESTMENTS

Our investments are primarily composed of fixed income debt securities and common stock equity securities. We carry our equity securities at fair value and categorize all of our debt securities as available-for-sale, which are carried at fair value. When available, we obtain quoted market prices to determine fair value for our investments. If a quoted market price is not available, fair value is estimated using a secondary pricing source or using quoted market prices of similar securities. We have no investment securities for which fair value is determined using Level 3 inputs as defined in note 3 to the unaudited condensed consolidated interim financial statements, "Fair Value Measurements."

*Fixed Income Securities - Available-for-Sale*

The amortized cost and fair value of available-for-sale securities at June 30, 2018 and December 31, 2017 were as follows:

**Available-for-sale**
(in thousands)

| Asset Class | | June 30, 2018 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Cost or Amortized Cost | | Gross Unrealized Gains | | Gross Unrealized Losses | | Fair Value |
| U.S. government | $ | 151,446 | $ | 96 | $ | (2,377) | $ | 149,165 |
| U.S. agency | | 30,650 | | 213 | | (607) | | 30,256 |
| Non-U.S. govt. & agency | | 8,186 | | - | | (291) | | 7,895 |
| Agency MBS | | 364,298 | | 1,685 | | (11,638) | | 354,345 |
| ABS/CMBS* | | 101,075 | | 152 | | (1,033) | | 100,194 |
| Corporate | | 633,159 | | 3,061 | | (11,534) | | 624,686 |
| Municipal | | 438,261 | | 8,198 | | (2,388) | | 444,071 |
| **Total Fixed Income** | $ | **1,727,075** | $ | **13,405** | $ | **(29,868)** | $ | **1,710,612** |

**Available-for-sale**
(in thousands)

| Asset Class | | December 31, 2017 | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | Cost or Amortized Cost | | Gross Unrealized Gains | | Gross Unrealized Losses | | Fair Value |
| U.S. government | $ | 92,561 | $ | 23 | $ | (895) | $ | 91,689 |
| U.S. agency | | 18,541 | | 347 | | (110) | | 18,778 |
| Non-U.S. govt. & agency | | 7,501 | | 143 | | (56) | | 7,588 |
| Agency MBS | | 329,129 | | 3,420 | | (4,078) | | 328,471 |
| ABS/CMBS* | | 70,405 | | 436 | | (315) | | 70,526 |
| Corporate | | 508,128 | | 12,575 | | (1,681) | | 519,022 |
| Municipal | | 620,146 | | 17,272 | | (1,253) | | 636,165 |
| **Total Fixed Income** | $ | **1,646,411** | $ | **34,216** | $ | **(8,388)** | $ | **1,672,239** |

*Non-agency asset-backed and commercial mortgage-backed

The following table presents the amortized cost and fair value of available-for-sale debt securities by contractual maturity dates as of June 30, 2018:

| Available-for-sale (in thousands) | | June 30, 2018 | | | |
| --- | --- | --- | --- | --- | --- |
| | | Amortized Cost | | Fair Value | |
| Due in one year or less | $ | 37,920 | $ | 37,787 | |
| Due after one year through five years | | 349,532 | | 349,582 | |
| Due after five years through 10 years | | 653,536 | | 648,164 | |
| Due after 10 years | | 220,714 | | 220,540 | |
| Mtge/ABS/CMBS* | | 465,373 | | 454,539 | |
| Total available-for-sale | $ | 1,727,075 | $ | 1,710,612 | |

*Mortgage-backed, asset-backed and commercial mortgage-backed

*Unrealized Losses on Fixed Income Securities*

We conduct and document periodic reviews of all fixed income securities with unrealized losses to evaluate whether the impairment is other-than-temporary. The following tables are used as part of our impairment analysis and illustrate the total value of fixed income securities that were in an unrealized loss position as of June 30, 2018 and December 31, 2017. The tables segregate the securities based on type, noting the fair value, cost (or amortized cost) and unrealized loss on each category of investment as well as

12

in total. The tables further classify the securities based on the length of time they have been in an unrealized loss position. As of June 30, 2018 unrealized losses on fixed income securities, as shown in the following tables, were 1.4 percent of total invested assets. Unrealized losses increased through the first half of 2018, as interest rates increased from the end of 2017, which decreased the fair value of securities held in the fixed income portfolio.

| (in thousands) | June 30, 2018 | | | December 31, 2017 | | |
|---|---|---|---|---|---|---|
| | < 12 Mos. | 12 Mos. & Greater | Total | < 12 Mos. | 12 Mos. & Greater | Total |
| **U.S. Government** | | | | | | |
| Fair value | $ 104,958 | $ 33,589 | $ 138,547 | $ 58,009 | $ 30,888 | $ 88,897 |
| Cost or amortized cost | 106,718 | 34,206 | 140,924 | 58,443 | 31,349 | 89,792 |
| Unrealized Loss | $ (1,760) | $ (617) | $ (2,377) | $ (434) | $ (461) | $ (895) |
| **U.S. Agency** | | | | | | |
| Fair value | $ 15,422 | $ — | $ 15,422 | $ 10,917 | $ — | $ 10,917 |
| Cost or amortized cost | 16,029 | — | 16,029 | 11,027 | — | 11,027 |
| Unrealized Loss | $ (607) | $ — | $ (607) | $ (110) | $ — | $ (110) |
| **Non-U.S. government** | | | | | | |
| Fair value | $ 6,208 | $ 1,687 | $ 7,895 | $ — | $ 1,840 | $ 1,840 |
| Cost or amortized cost | 6,289 | 1,897 | 8,186 | — | 1,896 | 1,896 |
| Unrealized Loss | $ (81) | $ (210) | $ (291) | $ — | $ (56) | $ (56) |
| **Agency MBS** | | | | | | |
| Fair value | $ 199,344 | $ 106,745 | $ 306,089 | $ 122,130 | $ 111,306 | $ 233,436 |
| Cost or amortized cost | 205,847 | 111,880 | 317,727 | 123,559 | 113,955 | 237,514 |
| Unrealized Loss | $ (6,503) | $ (5,135) | $ (11,638) | $ (1,429) | $ (2,649) | $ (4,078) |
| **ABS/CMBS*** | | | | | | |
| Fair value | $ 66,925 | $ 18,028 | $ 84,953 | $ 23,406 | $ 21,587 | $ 44,993 |
| Cost or amortized cost | 67,707 | 18,279 | 85,986 | 23,491 | 21,817 | 45,308 |
| Unrealized Loss | $ (782) | $ (251) | $ (1,033) | $ (85) | $ (230) | $ (315) |
| **Corporate** | | | | | | |
| Fair value | $ 391,379 | $ 34,255 | $ 425,634 | $ 86,946 | $ 28,600 | $ 115,546 |
| Cost or amortized cost | 400,716 | 36,452 | 437,168 | 87,736 | 29,491 | 117,227 |
| Unrealized Loss | $ (9,337) | $ (2,197) | $ (11,534) | $ (790) | $ (891) | $ (1,681) |
| **Municipal** | | | | | | |
| Fair value | $ 85,824 | $ 22,227 | $ 108,051 | $ 71,059 | $ 60,049 | $ 131,108 |
| Cost or amortized cost | 87,458 | 22,981 | 110,439 | 71,534 | 60,827 | 132,361 |
| Unrealized Loss | $ (1,634) | $ (754) | $ (2,388) | $ (475) | $ (778) | $ (1,253) |
| **Total fixed income** | | | | | | |
| Fair value | $ 870,060 | $ 216,531 | $ 1,086,591 | $ 372,467 | $ 254,270 | $ 626,737 |
| Cost or amortized cost | 890,764 | 225,695 | 1,116,459 | 375,790 | 259,335 | 635,125 |
| Unrealized Loss | $ (20,704) | $ (9,164) | $ (29,868) | $ (3,323) | $ (5,065) | $ (8,388) |

* Non-agency asset-backed and commercial mortgage-backed

The following table shows the composition of the fixed income securities in unrealized loss positions at June 30, 2018 by the National Association of Insurance Commissioners (NAIC) rating and the generally equivalent Standard & Poor's (S&P) and Moody's ratings. The vast majority of the securities are rated by S&P and/or Moody's.

Table of Contents

| NAIC Rating | Equivalent S&P Rating | Equivalent Moody's Rating | (dollars in thousands) | | | |
|---|---|---|---|---|---|---|
| | | | Amortized Cost | Fair Value | Unrealized Loss | Percent to Total |
| 1 | AAA/AA/A | Aaa/Aa/A | $  932,315 | $  908,318 | $  (23,997) | 80.3 % |
| 2 | BBB | Baa | 124,031 | 119,785 | (4,246) | 14.2 % |
| 3 | BB | Ba | 36,317 | 35,400 | (917) | 3.1 % |
| 4 | B | B | 21,826 | 21,267 | (559) | 1.9 % |
| 5 | CCC | Caa | 1,354 | 1,243 | (111) | 0.4 % |
| 6 | CC or lower | Ca or lower | 616 | 578 | (38) | 0.1 % |
| | | Total | $  1,116,459 | $  1,086,591 | $  (29,868) | 100.0 % |

*Evaluating Fixed Income Securities for OTTI*

The fixed income portfolio contained 706 securities in an unrealized loss position as of June 30, 2018. The $29.9 million in associated unrealized losses for these 706 securities represents 1.7 percent of the fixed income portfolio's cost basis. Of these 706 securities, 121 have been in an unrealized loss position for 12 consecutive months or longer. All fixed income securities in the investment portfolio continue to pay the expected coupon payments under the contractual terms of the securities. Any credit-related impairment related to fixed income securities we do not plan to sell and for which we are not more likely than not to be required to sell is recognized in net earnings, with the non-credit related impairment recognized in comprehensive earnings. Based on our analysis, our fixed income portfolio is of high credit quality and we believe we will recover the amortized cost basis of our fixed income securities. We continually monitor the credit quality of our fixed income investments to assess if it is probable that we will receive our contractual or estimated cash flows in the form of principal and interest. In the first six months of 2018, we recognized $0.1 million in other-than-temporary impairment (OTTI) charges in earnings on one fixed income security that we no longer had the intent to hold. Comparatively, we recognized $2.1 million in OTTI losses in earnings on two fixed income securities that we no longer had the intent to hold in same period in 2017. There were no OTTI losses recognized in other comprehensive earnings on the fixed income portfolio for the periods presented.

*Unrealized Gains and Losses on Equity Securities*

During the second quarter of 2018, net unrealized losses on equity securities included an unrealized gain of $9.1 million on securities held as of June 30, 2018. Net unrealized losses on equity securities for the first half of 2018 included an unrealized loss of $4.8 million on securities held as of June 30, 2018.

*Other Invested Assets*

We had $36.6 million of other invested assets at June 30, 2018, compared to $33.8 million at the end of 2017. Other invested assets include investments in low income housing tax credit partnerships (LIHTC), membership in the Federal Home Loan Bank of Chicago (FHLBC) and investments in private funds. Our LIHTC investments are carried at amortized cost and our investment in FHLBC stock is carried at cost. Due to the nature of the LIHTC and our membership in the FHLBC, their carrying amounts approximate fair value. The private funds are carried at fair value, using each investment's net asset value.

Our LIHTC interests had a balance of $14.5 million at June 30, 2018, compared to $15.5 million at December 31, 2017 and recognized a total tax benefit of $0.6 million during the second quarter of 2018, the same as the prior year. For the six-month periods ended June 30, 2018 and 2017, our LIHTC interests recognized a total benefit of $1.1 million and $1.3 million, respectively. Our unfunded commitment for our LIHTC investments totaled $2.0 million at June 30, 2018 and will be paid out in installments through 2025.

As of June 30, 2018, $16.8 million of investments were pledged as collateral with the FHLBC to ensure timely access to the secured lending facility that ownership of FHLBC stock provides. As of and during the six month period ending June 30, 2018, there were no outstanding borrowings with the FHLBC.

We had $28.2 million of unfunded commitments related to our investments in private funds at June 30, 2018. Additionally, our interest in these investments is generally restricted from being transferred or otherwise redeemed without prior consent by the respective entities. An IPO would allow for the transfer of interest in some situations, while the timed dissolution of the partnership would trigger redemption in others.

Table of Contents

*Cash and Short-term Investments*

Cash consists of uninvested balances in bank accounts. We had a cash balance of $34.1 million at June 30, 2018, compared to $24.3 million at the end of 2017. We did not have any short-term investments at June 30, 2018, but had $10.0 million of short-term investments that were carried at cost and approximated fair value at December 31, 2017.

**3.   FAIR VALUE MEASUREMENTS**

***Assets and Liabilities Recorded at Fair Value on a Recurring Basis***

Fair value is defined as the price in the principal market that would be received for an asset to facilitate an orderly transaction between market participants on the measurement date.

We determined the fair value of certain financial instruments based on their underlying characteristics and relevant transactions in the marketplace. We maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

Financial assets are classified based upon the lowest level of significant input that is used to determine fair value. The following are the levels of the fair value hierarchy and a brief description of the type of valuation inputs that are used to establish each level:

**Pricing Level 1** is applied to valuations based on readily available, unadjusted quoted prices in active markets for identical assets.

**Pricing Level 2** is applied to valuations based upon quoted prices for similar assets in active markets, quoted prices for identical or similar assets in inactive markets; or valuations based on models where the significant inputs are observable (e.g. interest rates, yield curves, prepayment speeds, default rates, loss severities) or can be corroborated by observable market data.

**Pricing Level 3** is applied to valuations that are derived from techniques in which one or more of the significant inputs are unobservable.

As a part of management's process to determine fair value, we utilize widely recognized, third-party pricing sources to determine our fair values. We have obtained an understanding of the third-party pricing sources' valuation methodologies and inputs. The following is a description of the valuation techniques used for financial assets that are measured at fair value, including the general classification of such assets pursuant to the fair value hierarchy.

**Corporate, Agencies, Government and Municipal Bonds:** The pricing vendor employs a multi-dimensional model which uses standard inputs including (listed in approximate order of priority for use) benchmark yields, reported trades, broker/dealer quotes, issuer spreads, two-sided markets, benchmark securities, market bids/offers and other reference data. The pricing vendor also monitors market indicators, as well as industry and economic events. All bonds valued using these techniques are classified as Level 2. All corporate, agency, government and municipal securities were deemed Level 2.

**Mortgage-backed Securities (MBS)/Commercial Mortgage-backed Securities (CMBS) and Asset-backed Securities (ABS):** The pricing vendor evaluation methodology includes principally interest rate movements and new issue data. Evaluation of the tranches (non-volatile, volatile or credit sensitivity) is based on the pricing vendors' interpretation of accepted modeling and pricing conventions. This information is then used to determine the cash flows for each tranche, benchmark yields, prepayment assumptions and to incorporate collateral performance. To evaluate MBS and CMBS volatility, an option adjusted spread model is used in combination with models that simulate interest rate paths to determine market price information. This process allows the pricing vendor to obtain evaluations of a broad universe of securities in a way that reflects changes in yield curve, index rates, implied volatility, mortgage rates and recent trade activity. MBS/CMBS and ABS with corroborated, observable inputs are classified as Level 2. All of our MBS/CMBS and ABS are deemed Level 2.

**Common Stock:** Exchange traded equities have readily observable price levels and are classified as Level 1 (fair value based on quoted market prices). All of our common stock holdings are deemed Level 1.

For the Level 2 securities, as described above, we periodically conduct a review to assess the reasonableness of the fair values provided by our pricing services. Our review consists of a two pronged approach. First, we compare prices provided by

Table of Contents

our pricing services to those provided by an additional source. Second, we obtain prices from securities brokers and compare them to the prices provided by our pricing services. In both comparisons, when discrepancies are found, we compare our prices to actual reported trade data for like securities. Based on this assessment, we determined that the fair values of our Level 2 securities provided by our pricing services are reasonable.

For common stock, we receive prices from a nationally recognized pricing service. Prices are based on observable inputs in an active market and are therefore disclosed as Level 1. Based on this assessment, we determined that the fair values of our Level 1 securities provided by our pricing service are reasonable.

Our investments in private funds, classified as other invested assets, are carried at fair value and are measured using each investment's net asset value, but are not categorized within the fair value hierarchy.

Due to the relatively short-term nature of cash, short-term investments, accounts receivable and accounts payable, their carrying amounts are reasonable estimates of fair value.

Assets measured at fair value in the accompanying unaudited condensed consolidated interim financial statements on a recurring basis are summarized below:

| (in thousands) | As of June 30, 2018 | | | |
| | Fair Value Measurements Using | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Fixed income securities - available-for-sale | | | | |
| U.S. government | $ — | $ 149,165 | $ — | $ 149,165 |
| U.S. agency | — | 30,256 | — | 30,256 |
| Non-U.S. govt. & agency | — | 7,895 | — | 7,895 |
| Agency MBS | — | 354,345 | — | 354,345 |
| ABS/CMBS* | — | 100,194 | — | 100,194 |
| Corporate | — | 624,686 | — | 624,686 |
| Municipal | — | 444,071 | — | 444,071 |
| Total fixed income securities - available-for-sale | $ — | $ 1,710,612 | $ — | $ 1,710,612 |
| Equity securities | 386,603 | — | — | 386,603 |
| Total | $ 386,603 | $ 1,710,612 | $ — | $ 2,097,215 |

| (in thousands) | As of December 31, 2017 | | | |
| | Fair Value Measurements Using | | | |
| | Quoted Prices in Active Markets for Identical Assets (Level 1) | Significant Other Observable Inputs (Level 2) | Significant Unobservable Inputs (Level 3) | Total |
|---|---|---|---|---|
| Fixed income securities - available-for-sale | | | | |
| U.S. government | $ — | $ 91,689 | $ — | $ 91,689 |
| U.S. agency | — | 18,778 | — | 18,778 |
| Non-U.S. govt. & agency | — | 7,588 | — | 7,588 |
| Agency MBS | — | 328,471 | — | 328,471 |
| ABS/CMBS* | — | 70,526 | — | 70,526 |
| Corporate | — | 519,022 | — | 519,022 |
| Municipal | — | 636,165 | — | 636,165 |
| Total fixed income securities - available-for-sale | $ — | $ 1,672,239 | $ — | $ 1,672,239 |
| Equity securities | 400,492 | — | — | 400,492 |
| Total | $ 400,492 | $ 1,672,239 | $ — | $ 2,072,731 |

* Non-agency asset-backed and commercial mortgage-backed

Table of Contents

As noted in the above table, we did not have any assets measured at fair value on a recurring basis using significant unobservable inputs (Level 3) during the period. Additionally, there were no securities transferred in or out of levels 1 or 2 during the six-month period ended June 30, 2018.

## 4. HISTORICAL LOSS AND LAE DEVELOPMENT

The following table is a reconciliation of our unpaid losses and settlement expenses (LAE) for the first six months of 2018 and 2017.

| (in thousands) | For the Six-Month Periods Ended June 30, | |
|---|---|---|
| | 2018 | 2017 |
| Unpaid losses and LAE at beginning of year | | |
| Gross | $ 1,271,503 | $ 1,139,337 |
| Ceded | (301,991) | (288,224) |
| Net | $ 969,512 | $ 851,113 |
| | | |
| Increase (decrease) in incurred losses and LAE | | |
| Current accident year | $ 222,121 | $ 203,371 |
| Prior accident years | (28,047) | (19,634) |
| Total incurred | $ 194,074 | $ 183,737 |
| | | |
| Loss and LAE payments for claims incurred | | |
| Current accident year | $ (16,805) | $ (18,732) |
| Prior accident year | (118,650) | (113,501) |
| Total paid | $ (135,455) | $ (132,233) |
| | | |
| Net unpaid losses and LAE at June 30, | $ 1,028,131 | $ 902,617 |
| | | |
| Unpaid losses and LAE at June 30, | | |
| Gross | $ 1,343,248 | $ 1,183,185 |
| Ceded | (315,117) | (280,568) |
| Net | $ 1,028,131 | $ 902,617 |

For the first six months of 2018, incurred losses and LAE included $28.0 million of favorable development on prior years' loss reserves. The majority of products experienced modest amounts of favorable development on prior accident years, with notable contributions from commercial and personal umbrella, general liability, marine and surety. Executive products, transportation and medical professional liability were exceptions, experiencing adverse development.

For the first six months of 2017, incurred losses and LAE included $19.6 million of favorable development on prior years' loss reserves. Commercial umbrella, general liability, executive products, surety and marine were drivers of the favorable development, while adverse experience in transportation and medical professional liability partially offset the result.

## 5. INCOME TAXES

Our effective tax rate for the three and six-month periods ended June 30, 2018 was 16.0 percent and 15.7 percent, respectively, compared to 23.0 percent and 23.9 percent, respectively, for the same periods in 2017. The Tax Cuts and Jobs Act of 2017 (TCJA) lowered the federal corporate tax rate from 35 percent to 21 percent effective January 1, 2018, which accounts for the majority of the decrease in effective tax rate for each period over the prior year. Effective rates are also dependent upon components of pretax earnings and the related tax effects. Tax favored investment activity was lower in 2018, which resulted in a lower spread between the corporate rate and effective rate when compared to 2017. There have been no changes to the provisional amounts that we recorded in the fourth quarter of 2017 associated with the TCJA as no new information has been made available by the Internal Revenue Service.

Income tax expense attributable to income from operations for the three and six-month periods ended June 30, 2018 and 2017 differed from the amounts computed by applying the U.S. federal tax rate of 21 percent and 35 percent, respectively, to

pretax income by the items detailed in the below table. In interim periods, income taxes are adjusted to reflect the effective tax rate we anticipate for the year, with adjustments flowing through the other items line.

| (in thousands) | For the Three - Month Periods Ended June 30, 2018 Amount | % | 2017 Amount | % | For the Six- Month Periods Ended June 30, 2018 Amount | % | 2017 Amount | % |
|---|---|---|---|---|---|---|---|---|
| Provision for income taxes at the statutory rate of 21% in 2018 and 35% in 2017 | $ 8,308 | 21.0 % | $ 11,912 | 35.0 % | $ 11,327 | 21.0 % | $ 21,168 | 35.0 % |
| Increase (reduction) in taxes resulting from: | | | | | | | | |
| Excess tax benefit on share-based compensation | (924) | (2.3) % | (2,791) | (8.2) % | (2,067) | (3.9) % | (3,234) | (5.3) % |
| Tax exempt interest income | (504) | (1.3) % | (1,160) | (3.4) % | (1,085) | (2.0) % | (2,338) | (3.9) % |
| Dividends received deduction | (169) | (0.4) % | (405) | (1.2) % | (366) | (0.7) % | (935) | (1.5) % |
| ESOP dividends paid deduction | (145) | (0.4) % | (251) | (0.7) % | (284) | (0.5) % | (484) | (0.8) % |
| Other items, net | (255) | (0.6) % | 523 | 1.5 % | 948 | 1.8 % | 266 | 0.4 % |
| Total tax expense | $ 6,311 | 16.0 % | $ 7,828 | 23.0 % | $ 8,473 | 15.7 % | $ 14,443 | 23.9 % |

## 6. STOCK BASED COMPENSATION

Our RLI Corp. Omnibus Stock Plan (omnibus plan) was in place from 2005 to 2010. The omnibus plan provided for equity-based compensation, including stock options, up to a maximum of 3,000,000 shares of common stock (subject to adjustment for changes in our capitalization and other events). Between 2005 and 2010, we granted 2,458,059 stock options under this plan, including incentive stock options (ISOs), which were adjusted as part of the special dividends paid in 2014 and prior years. The omnibus plan was replaced in 2010.

In 2010, our shareholders approved the RLI Corp. Long-Term Incentive Plan (2010 LTIP), which provides for equity-based compensation and replaced the omnibus plan. In conjunction with the adoption of the 2010 LTIP, effective May 6, 2010, options were no longer granted under the omnibus plan. The 2010 LTIP provided for equity-based compensation, including stock options, up to a maximum of 4,000,000 shares of common stock (subject to adjustment for changes in our capitalization and other events). Between 2010 and 2015, we granted 2,878,000 stock options under the 2010 LTIP. The 2010 LTIP was replaced in 2015.

In 2015, our shareholders approved the 2015 RLI Corp. Long-Term Incentive Plan (2015 LTIP), which provides for equity-based compensation and replaced the 2010 LTIP. In conjunction with the adoption of the 2015 LTIP, effective May 7, 2015, options were no longer granted under the 2010 LTIP. Awards under the 2015 LTIP may be in the form of restricted stock, restricted stock units, stock options (non-qualified only), stock appreciation rights, performance units as well as other stock-based awards. Eligibility under the 2015 LTIP is limited to employees and directors of the company or any affiliate. The granting of awards under the 2015 LTIP is solely at the discretion of the board of directors. The maximum number of shares of common stock available for distribution under the 2015 LTIP is 4,000,000 shares (subject to adjustment for changes in our capitalization and other events). Since 2015, we have granted 1,837,828 awards under the 2015 LTIP, including 389,253 thus far in 2018.

**Stock Options**

Under the 2015 LTIP, as under the 2010 LTIP and omnibus plan, we grant stock options for shares with an exercise price equal to the fair market value of the shares at the date of grant (subject to adjustments for changes in our capitalization, special dividends and other events as set forth in such plans). Options generally vest and become exercisable ratably over a five-year period and expire eight years after grant.

For most participants, the requisite service period and vesting period will be the same. For participants who are retirement eligible, defined by the plan as those individuals whose age and years of service equals 75, the requisite service period is deemed to be met and options are immediately expensed on the date of grant. For participants who will become retirement eligible during the vesting period, the requisite service period over which expense is recognized is the period between the grant date and the attainment of retirement eligibility. Shares issued upon option exercise are newly issued shares.

Table of Contents

The following tables summarize option activity for the periods ended June 30, 2018 and 2017:

| | Number of Options Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value (in 000's) |
|---|---|---|---|---|---|---|
| Outstanding options at January 1, 2018 | 2,257,015 | $ | 46.80 | | | |
| Options granted | 367,500 | $ | 63.27 | | | |
| Options exercised | (337,000) | $ | 31.60 | | $ | 11,151 |
| Options canceled/forfeited | (5,200) | $ | 62.04 | | | |
| Outstanding options at June 30, 2018 | 2,282,315 | $ | 51.66 | 5.34 | $ | 33,224 |
| Exercisable options at June 30, 2018 | 996,265 | $ | 44.04 | 3.89 | $ | 22,089 |

| | Number of Options Outstanding | | Weighted Average Exercise Price | Weighted Average Remaining Contractual Life | | Aggregate Intrinsic Value (in 000's) |
|---|---|---|---|---|---|---|
| Outstanding options at January 1, 2017 | 2,207,110 | $ | 40.90 | | | |
| Options granted | 407,875 | $ | 56.88 | | | |
| Options exercised | (134,090) | $ | 25.23 | | $ | 4,328 |
| Options canceled/forfeited | (40,600) | $ | 48.09 | | | |
| Outstanding options at June 30, 2017 | 2,440,295 | $ | 44.32 | 5.03 | $ | 29,968 |
| Exercisable options at June 30, 2017 | 1,162,455 | $ | 35.77 | 3.47 | $ | 22,859 |

The majority of our stock options are granted annually at our regular board meeting in May. In addition, options are approved at the May meeting for quarterly grants to certain retirement eligible employees. Since stock option grants to retirement eligible employees are fully expensed when issued, the approach allows for a more even expense distribution throughout the year.

Thus far in 2018, 367,500 stock options were granted with a weighted average exercise price of $63.27 and a weighted average fair value of $10.20. We recognized $1.3 million of expense in the second quarter of 2018 and $2.3 million in the first six months of 2018 related to options vesting. Since options granted under our 2010 LTIP and 2015 LTIP are non-qualified, we recorded a tax benefit of $0.3 million in the second quarter of 2018 and $0.5 million in the first six months of 2018 related to this compensation expense. Total unrecognized compensation expense relating to outstanding and unvested options was $7.0 million, which will be recognized over the remainder of the vesting period. Comparatively, we recognized $1.2 million of expense in the second quarter of 2017 and $2.0 million in the first six months of 2017. We recorded a tax benefit of $0.4 million in the second quarter of 2017 and $0.7 million in the first six months of 2017 related to this compensation expense.

The fair value of options was estimated using a Black-Scholes based option pricing model with the following weighted average grant-date assumptions and weighted average fair values as of June 30:

| | 2018 | 2017 |
|---|---|---|
| Weighted-average fair value of grants | $ 10.20 | $ 7.94 |
| Risk-free interest rates | 2.69 % | 1.89 % |
| Dividend yield | 3.15 % | 3.60 % |
| Expected volatility | 22.88 % | 22.95 % |
| Expected option life | 5.06 years | 5.05 years |

The risk-free rate was determined based on U.S. treasury yields that most closely approximated the option's expected life. The dividend yield was determined based on the average annualized quarterly dividends paid during the most recent five-year period and incorporated a consideration for special dividends paid in recent history. The expected volatility was calculated based on the median of the rolling volatilities for the expected life of the options. The expected option life was determined based on historical exercise behavior and the assumption that all outstanding options will be exercised at the midpoint of the current date and remaining contractual term, adjusted for the demographics of the current year's grant.

19

**Restricted Stock Units**

In addition to stock options, restricted stock units (RSUs) are granted with a value equal to the closing stock price of the Company's stock on the dates the shares are granted. Generally, these units have a three-year cliff vesting. When participants terminate employment with the Company after having met the definition of retirement under the 2015 LTIP, defined as those individuals whose age and years of service equals 75, the RSUs will become fully vested. In addition, the RSUs have dividend participation which accrues and is settled in additional shares with all granted stock units at the end of the three-year period.

As of June 30, 2018, 30,075 RSUs have been granted to employees under the 2015 LTIP, including 14,625 during 2018, and 29,675 remain outstanding. We recognized $0.1 million of expense on these units in the second quarter of 2018 and $0.2 million in the first six months of 2018. Total unrecognized compensation expense relating to outstanding and unvested RSUs was $1.1 million, which will be recognized over the remainder of the vesting period. Comparatively, we recognized $0.2 million related to this compensation expense in the three and six-month period ended June 30, 2017.

In 2018, each outside director received restricted stock units with a fair market value of $50,000 on the date of grant as part of annual director compensation. The units were granted from the 2015 LTIP at the May board meeting and vest one year from the date of grant. In the second quarter of 2018, we granted a total of 7,128 restricted stock units and recognized $0.1 million of compensation expense. Total unrecognized compensation expense relating to outstanding and unvested director RSUs was $0.4 million, which will be recognized over the remainder of the vesting period.

**7. OPERATING SEGMENT INFORMATION**

Selected information by operating segment is presented in the table below. Additionally, the table reconciles segment totals to total earnings and total revenues.

| REVENUES (in thousands) | For the Three-Month Periods Ended June 30, | | For the Six-Month Periods Ended June 30, | |
|---|---|---|---|---|
| | 2018 | 2017 | 2018 | 2017 |
| Casualty | $ 129,613 | $ 119,259 | $ 255,463 | $ 236,243 |
| Property | 37,190 | 34,485 | 72,372 | 70,290 |
| Surety | 29,719 | 30,587 | 58,714 | 61,083 |
| Net premiums earned | $ 196,522 | $ 184,331 | $ 386,549 | $ 367,616 |
| Net investment income | 14,577 | 13,238 | 28,809 | 26,243 |
| Net realized gains (losses) | 20,849 | (1,359) | 29,253 | (735) |
| Net unrealized losses on equity securities | (12,611) | - | (39,383) | - |
| Total consolidated revenue | $ 219,337 | $ 196,210 | $ 405,228 | $ 393,124 |

| NET EARNINGS (in thousands) | 2018 | 2017 | 2018 | 2017 |
|---|---|---|---|---|
| Casualty | $ 2,854 | $ 8,648 | $ 4,415 | $ 1,767 |
| Property | 3,647 | 2,863 | 9,529 | 11,667 |
| Surety | 7,645 | 8,232 | 17,689 | 19,366 |
| Net underwriting income | $ 14,146 | $ 19,743 | $ 31,633 | $ 32,800 |
| Net investment income | 14,577 | 13,238 | 28,809 | 26,243 |
| Net realized gains (losses) | 20,849 | (1,359) | 29,253 | (735) |
| Net unrealized losses on equity securities | (12,611) | - | (39,383) | - |
| General corporate expense and interest on debt | (4,499) | (4,392) | (8,638) | (9,573) |
| Equity in earnings of unconsolidated investees | 7,100 | 6,806 | 12,266 | 11,744 |
| Total earnings before income taxes | $ 39,562 | $ 34,036 | $ 53,940 | $ 60,479 |
| Income tax expense | 6,311 | 7,828 | 8,473 | 14,443 |
| Total net earnings | $ 33,251 | $ 26,208 | $ 45,467 | $ 46,036 |

The following table further summarizes revenues by major product type within each operating segment:

| NET PREMIUMS EARNED (in thousands) | For the Three-Month Periods Ended June 30, | | | | For the Six-Month Periods Ended June 30, | | | |
|---|---|---|---|---|---|---|---|---|
| | 2018 | | 2017 | | 2018 | | 2017 | |
| **Casualty** | | | | | | | | |
| Commercial and personal umbrella | $ | 30,649 | $ | 28,861 | $ | 60,601 | $ | 57,438 |
| General liability | | 23,338 | | 22,851 | | 46,503 | | 44,434 |
| Commercial transportation | | 20,648 | | 20,395 | | 39,823 | | 41,496 |
| Professional services | | 19,846 | | 20,016 | | 39,669 | | 39,242 |
| Small commercial | | 12,901 | | 11,765 | | 25,791 | | 24,052 |
| Executive products | | 5,144 | | 4,438 | | 10,196 | | 8,850 |
| Medical professional liability | | 4,362 | | 4,265 | | 8,834 | | 8,556 |
| Other casualty | | 12,725 | | 6,668 | | 24,046 | | 12,175 |
| Total | $ | 129,613 | $ | 119,259 | $ | 255,463 | $ | 236,243 |
| | | | | | | | | |
| **Property** | | | | | | | | |
| Commercial property | $ | 17,856 | $ | 15,873 | $ | 34,807 | $ | 31,591 |
| Marine | | 14,941 | | 11,607 | | 28,798 | | 23,893 |
| Specialty personal | | 4,129 | | 5,508 | | 8,271 | | 11,526 |
| Property reinsurance | | 14 | | 1,479 | | 26 | | 3,262 |
| Other property | | 250 | | 18 | | 470 | | 18 |
| Total | $ | 37,190 | $ | 34,485 | $ | 72,372 | $ | 70,290 |
| | | | | | | | | |
| **Surety** | | | | | | | | |
| Miscellaneous | $ | 11,719 | $ | 11,854 | $ | 23,361 | $ | 23,711 |
| Commercial | | 6,761 | | 6,938 | | 13,474 | | 14,081 |
| Contract | | 7,012 | | 7,147 | | 13,358 | | 14,231 |
| Energy | | 4,227 | | 4,648 | | 8,521 | | 9,060 |
| Total | $ | 29,719 | $ | 30,587 | $ | 58,714 | $ | 61,083 |
| | | | | | | | | |
| **Grand Total** | $ | 196,522 | $ | 184,331 | $ | 386,549 | $ | 367,616 |

## 8. CONTINGENT LIABILITIES

*Carriage Hill Associates Coverage Dispute*

In December 2010, Carriage Hill Associates of Charleston, LLC and certain other plaintiffs (collectively, "Plaintiffs") filed a complaint in the Court of Common Pleas (the "Court") for the Ninth Judicial Circuit of Berkeley County, South Carolina against Mt. Hawley Insurance Company ("Mt. Hawley"), a subsidiary of our principal subsidiary, RLI Insurance Company, relating to a coverage dispute. The complaint seeks, among other things, compensatory damages, punitive damages and attorneys' fees.

On May 25, 2018, the Court issued an Order finding in favor of Plaintiffs (the "Order"). The Court held that Mt. Hawley was responsible for compensatory damages relating to the alleged breach of duty to defend, breach of duty to indemnify and breach of duty of good faith totaling $21.7 million. The Court further held that Plaintiffs are entitled to attorneys' fees and costs and that punitive damages are appropriate, with a hearing to be conducted at a later date to determine the amount of attorney fees and costs, and punitive damages.

Mt. Hawley continues to vigorously contest all the claims against it in this matter and has filed certain post-trial motions seeking to, among other things, set aside the Order. Management believes Mt. Hawley has numerous meritorious legal and factual defenses that support our conclusion that the ultimate resolution of this matter will not have a material adverse effect on our results of operations, cash flows or financial position. However, litigation is subject to inherent uncertainties, and there exists a reasonable possibility of an unfavorable outcome and such outcome may have a material adverse effect on our results of operations, cash flows or financial position in the period in which it occurs. At the present time, due to the substantial uncertainties that exist, management cannot reasonably estimate the loss or range of loss that could potentially be incurred based upon future developments in this matter.

## ITEM 2.      MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS.

"SAFE HARBOR" STATEMENT UNDER THE PRIVATE SECURITIES LITIGATION REFORM ACT OF 1995: This discussion and analysis may contain forward-looking statements within the meaning of Section 27A of the Securities Act of 1933 and Section 21E of the Securities Exchange Act of 1934 that are not historical facts, and involve risks and uncertainties that could cause actual results to differ materially from those expected and projected. Various risk factors that could affect future results are listed in our filings with the Securities and Exchange Commission, including the Annual Report on Form 10-K for the year ended December 31, 2017.

## OVERVIEW

RLI Corp. (the "Company") is an insurance holding company that was organized in 1965. On May 4, 2018, RLI Corp. changed its state of incorporation from the State of Illinois to the State of Delaware. For more information on the reincorporation, see note 1.A to the unaudited condensed consolidated interim financial statements. We underwrite selected property and casualty insurance through major subsidiaries collectively known as RLI Insurance Group (the Group). We conduct operations principally through three insurance companies. RLI Insurance Company (RLI Ins.), a subsidiary of RLI Corp. and our principal insurance subsidiary, writes multiple lines of insurance on an admitted basis in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands and Guam. Mt. Hawley Insurance Company (Mt. Hawley), a subsidiary of RLI Ins., writes excess and surplus lines insurance on a non-admitted basis in all 50 states, the District of Columbia, Puerto Rico, the Virgin Islands and Guam. Contractors Bonding and Insurance Company (CBIC), a subsidiary of RLI Ins., writes multiple lines of insurance on an admitted basis in all 50 states and the District of Columbia. Each of our insurance companies is domiciled in Illinois.

As a specialty insurance company with a niche focus, we offer insurance coverages in both the specialty admitted and excess and surplus markets. Coverages in the specialty admitted market, such as our energy surety bonds, are for risks that are unique or hard-to-place in the standard market, but must remain with an admitted insurance company for regulatory or marketing reasons. In addition, our coverages in the specialty admitted market may be designed to meet specific insurance needs of targeted insured groups, such as our professional liability and package coverages for design professionals and our stand-alone personal umbrella policy. The specialty admitted market is subject to more state regulation than the excess and surplus market, particularly with regard to rate and form filing requirements, restrictions on the ability to exit lines of business, premium tax payments and membership in various state associations, such as state guaranty funds and assigned risk plans. We also underwrite coverages in the excess and surplus market. The excess and surplus market, unlike the admitted market, is less regulated and more flexible in terms of policy forms and premium rates. This market provides an alternative for customers with risks or loss exposures that generally cannot be written in the standard market. This typically results in coverages that are more restrictive and more expensive than coverages in the admitted market. When we underwrite within the excess and surplus market, we are selective in the lines of business and type of risks we choose to write. Using our non-admitted status in this market allows us to tailor terms and conditions to manage these exposures effectively. Often, the development of these coverages is generated through proposals brought to us by an agent or broker seeking coverage for a specific group of clients or loss exposures. Once a proposal is submitted, our underwriters determine whether it would be a viable product based on our business objectives.

The foundation of our overall business strategy is to underwrite for profit in all market conditions and we have achieved this for 22 consecutive years, averaging an 87.8 combined ratio over that period of time. This drives our ability to provide shareholder returns in three different ways: the underwriting income itself, net investment income from our investment portfolio and long-term appreciation in our equity portfolio. Our investment strategy is based on preservation of capital as the first priority, with a secondary focus on generating total return. The fixed income portfolio consists primarily of highly-rated, diversified, liquid, investment-grade securities. Consistent underwriting income allows a portion of our investment portfolio to be invested in equity securities and other risk asset classes. Our equity portfolio consists of a core stock portfolio weighted toward dividend-paying stocks, as well as exchange traded funds (ETFs). Our minority equity ownership interests in Maui Jim, Inc. (Maui Jim), a manufacturer of high-quality sunglasses, and Prime Holdings Insurance Services, Inc. (Prime), a specialty insurance company, has also enhanced financial results. We have a diversified investment portfolio and closely monitor our investment risks. Despite periodic fluctuations in market value, our equity portfolio is part of a long-term asset allocation strategy and has contributed significantly to our historic growth in book value.

We measure the results of our insurance operations by monitoring certain measures of growth and profitability across three distinct business segments: casualty, property and surety. Growth is measured in terms of gross premiums written and

profitability is analyzed through combined ratios, which are further subdivided into their respective loss and expense components.

The property and casualty insurance business is cyclical and influenced by many factors, including price competition, economic conditions, natural or man-made disasters (for example, earthquakes, hurricanes and terrorism), interest rates, state regulations, court decisions and changes in the law.

One of the unique and challenging features of the property and casualty insurance business is that coverages must be priced before costs have fully developed, because premiums are charged before claims are incurred. This requires that liabilities be estimated and recorded in recognition of future loss and settlement obligations. Due to the inherent uncertainty in estimating these liabilities, there can be no assurance that actual liabilities will not be more or less than recorded amounts; if actual liabilities differ from recorded amounts, there will be an adverse or favorable effect on net earnings. In evaluating the objective performance measures previously mentioned, it is important to consider the following individual characteristics of each major insurance segment.

The casualty portion of our business consists largely of commercial umbrella, personal umbrella, general liability, transportation and executive products coverages, as well as package business and other specialty coverages, such as professional liability and workers' compensation for office-based professionals. We also offer fidelity and crime coverage for commercial insureds and select financial institutions and medical and healthcare professional liability coverage. The casualty business is subject to the risk of estimating losses and related loss reserves because the ultimate settlement of a casualty claim may take several years to fully develop. The casualty segment is also subject to inflation risk and may be affected by evolving legislation and court decisions that define the extent of coverage and the amount of compensation due for injuries or losses.

Our property segment is comprised primarily of commercial fire, earthquake, difference in conditions and marine coverages. We also offer select personal lines policies, including homeowners' coverages. Our property reinsurance and recreational vehicle products are in runoff after we began curtailing offerings at the end of 2015 and 2016, respectively. Property insurance results are subject to the variability introduced by perils such as earthquakes, fires and hurricanes. Our major catastrophe exposure is to losses caused by earthquakes, primarily on the West Coast. Our second largest catastrophe exposure is to losses caused by wind storms to commercial properties throughout the Gulf and East Coast, as well as to homes we insure in Hawaii. We limit our net aggregate exposure to a catastrophic event by minimizing the total policy limits written in a particular region, purchasing reinsurance and maintaining policy terms and conditions throughout market cycles. We also use computer-assisted modeling techniques to provide estimates that help us carefully manage the concentration of risks exposed to catastrophic events.

The surety segment specializes in writing small to large-sized commercial and contract surety coverages, as well as those for the energy, petrochemical and refining industries. We also offer miscellaneous bonds including license and permit, notary and court bonds. Often, our surety coverages involve a statutory requirement for bonds. While these bonds typically maintain a relatively low loss ratio, losses may fluctuate due to adverse economic conditions affecting the financial viability of our insureds. The contract surety product guarantees the construction work of a commercial contractor for a specific project. Generally, losses occur due to the deterioration of a contractor's financial condition. This line has historically produced marginally higher loss ratios than other surety lines during economic downturns.

The insurance marketplace is intensely competitive across all of our segments. Despite challenges that exist in today's marketplace, we believe that our business model is built to create underwriting income by focusing on sound risk selection and discipline. Our primary focus will continue to be on underwriting profitability, with a secondary focus on premium growth where we believe underwriting profit exists, as opposed to general premium growth or market share measurements.

### GAAP, non-GAAP and Performance Measures

Throughout this quarterly report, we include certain non-generally accepted accounting principles ("non-GAAP") financial measures. Management believes that these non-GAAP measures better explain the Company's results of operations and allow for a more complete understanding of the underlying trends in the Company's business. These measures should not be viewed as a substitute for those determined in accordance with generally accepted accounting principles in the United States of America (GAAP). In addition, our definitions of these items may not be comparable to the definitions used by other companies.

Following is a list of non-GAAP measures found throughout this report with their definitions, relationships to GAAP measures and explanations of their importance to our operations.

*Underwriting Income*

Underwriting income or profit represents one measure of the pretax profitability of our insurance operations and is derived by subtracting losses and settlement expenses, policy acquisition costs and insurance operating expenses from net premiums earned, which are all GAAP financial measures. Each of these captions is presented in the statements of earnings but is not subtotaled. However, this information is available in total and by segment in note 11 to the consolidated financial statements in our 2017 Annual Report on Form 10-K, regarding operating segment information. The nearest comparable GAAP measure is earnings before income taxes which, in addition to underwriting income, includes net investment income, net realized gains or losses, net unrealized gain or losses on equity securities in 2018, general corporate expenses, debt costs and our portion of earnings from unconsolidated investees.

*Combined Ratio*

The combined ratio, which is derived from components of underwriting income, is a common industry performance measure of profitability for underwriting operations and is calculated in two components. First, the loss ratio is losses and settlement expenses divided by net premiums earned. The second component, the expense ratio, reflects the sum of policy acquisition costs and insurance operating expenses divided by net premiums earned. All items included in these components of the combined ratio are presented in our GAAP consolidated financial statements. The sum of the loss and expense ratios is the combined ratio. The difference between the combined ratio and 100 reflects the per-dollar rate of underwriting income or loss. For example, a combined ratio of 85 implies that for every $100 of premium we earn, we record $15 of underwriting income.

*Net Unpaid Loss and Settlement Expenses*

Unpaid losses and settlement expenses, as shown in the liabilities section of our balance sheets, represents the total obligations to claimants for both estimates of known claims and estimates for incurred but not reported (IBNR) claims. The related asset item, reinsurance balances recoverable on unpaid losses and settlement expense, is the estimate of known claims and estimates of IBNR that we expect to recover from reinsurers. The net of these two items is generally referred to as net unpaid loss and settlement expenses and is commonly used in our disclosures regarding the process of establishing these various estimated amounts.

**Critical Accounting Policies**

In preparing the unaudited condensed consolidated interim financial statements, we are required to make estimates and assumptions that affect the reported amounts of assets and liabilities and the disclosures of contingent assets and liabilities as of the date of the condensed consolidated financial statements and the reported amounts of revenues and expenses for the reporting period. Actual results could differ significantly from those estimates.

The most critical accounting policies involve significant estimates and include those used in determining the liability for unpaid losses and settlement expenses, investment valuation and OTTI, recoverability of reinsurance balances, deferred policy acquisition costs and deferred taxes. For a detailed discussion of each of these policies, refer to our 2017 Annual Report on Form 10-K. There have been no significant changes to any of these policies during the current year.

**RESULTS OF OPERATIONS**

**Six Months Ended June 30, 2018 Compared to Six Months Ended June 30, 2017**

Consolidated revenue for the first half of 2018 increased $12.1 million, or 3 percent, from the same period in 2017. Net premiums earned for the Group increased 5 percent, driven by growth from our casualty and property segments, while investment income increased 10 percent due to an increased asset base and rising interest rates. Realized gains during the first half of 2018 were $29.3 million, compared to $0.7 million of realized losses during the same period of 2017. The 2018 gain was comprised of $34.5 million of realized gains on equity securities from rebalancing the portfolio, $0.9 million of realized losses on the fixed income portfolio and a $4.4 million non-cash impairment charge on goodwill and definite-lived intangible assets. This compares to realized gains of $3.9 million on equity securities, $1.5 million of losses on the fixed income portfolio and a $3.4 million non-cash impairment charge on goodwill and definite-lived intangible assets in 2017. These increases were partially offset by the $39.4 million of net unrealized losses on equity securities, which are required to be recognized in earnings for 2018 and forward due to the adoption of ASU 2016-01. Prior to 2018, unrealized gains and losses on equity securities were recognized through other comprehensive earnings.

Table of Contents

|  | For the Six-Month Periods Ended June 30, | |
| --- | --- | --- |
|  | 2018 | 2017 |
| **Consolidated revenues (in thousands)** | | |
| Net premiums earned | $ 386,549 | $ 367,616 |
| Net investment income | 28,809 | 26,243 |
| Net realized gains (losses) | 29,253 | (735) |
| Net unrealized losses on equity securities | (39,383) | - |
| Total consolidated revenue | $ 405,228 | $ 393,124 |

Net after-tax earnings for the first half of 2018 totaled $45.5 million, compared to $46.0 million for the same period last year. The reduction in earnings for 2018 was attributable to the $31.1 million of unrealized losses on equity securities, net of tax, recognized in net earnings. In 2017, these amounts were recognized through other comprehensive earnings. The impact of the unrealized losses was partially offset by the $23.1 million of realized gains, net of tax, in 2018. In comparison, 2017 had $0.5 million of realized losses, net of tax. Underwriting results for both periods reflect profitable current accident year results and favorable development from prior years' loss reserves. Favorable development on prior years' loss reserves provided additional pretax earnings of $29.3 million in the first half of 2018 compared to $20.5 million in 2017. The volcanic activity in Hawaii drove an increase in total catastrophe losses for the first half of the year, with $10.0 million of total catastrophe losses in 2018 and $3.0 million in 2017. Bonus and profit sharing-related expenses associated with the net impact of prior years' reserve development and catastrophe losses totaled $2.9 million in 2018, compared to $2.5 million in 2017. These performance-related expenses affected policy acquisition, insurance operating and general corporate expenses. Bonus and profit-sharing amounts earned by executives, managers and associates are predominately influenced by corporate performance including operating earnings, combined ratio and return on capital.

During the first half of 2018, equity in earnings of unconsolidated investees totaled $12.3 million. This amount includes $10.7 million from Maui Jim and $1.5 million from Prime. Comparatively, the first half of 2017 reflected $11.7 million of earnings, including $10.5 million from Maui Jim and $1.2 million from Prime. In addition, net earnings for the six-month period benefited from a lower effective tax rate, 16 percent in 2018 compared to 24 percent in 2017, resulting from the Tax Cuts and Jobs Act of 2017 (TCJA), which reduced the corporate tax rate from 35 percent to 21 percent beginning January 1, 2018.

Comprehensive earnings totaled $11.4 million for the first half of 2018, compared to $68.4 million for the first half of 2017. Other comprehensive earnings primarily included after-tax unrealized gains and losses from the fixed income portfolio in 2018 and after-tax unrealized gains and losses from both the fixed income and equity portfolios in 2017. The $34.1 million other comprehensive loss in the first half of 2018 was due to unrealized losses on the fixed income portfolio as interest rates rose during the first six months of the year. This compares to $22.4 million of other comprehensive earnings for the same period in 2017, as equity market returns were strong and interest rates declined slightly.

**RLI Insurance Group**

Gross premiums written for the Group increased 12 percent to $486.7 million for the first six months of 2018. The majority of our products contributed to growth in the period, with the bulk of the increase driven by products in our casualty and property segments. Net premiums earned increased $18.9 million, or 5 percent, also driven by products in our casualty and property segments.

| | | | Gross Premiums Written | | | | Net Premiums Earned | | |
| | | | For the Six-Month Periods Ended June 30, | | | | For the Six-Month Periods Ended June 30, | | |
| (in thousands) | | | 2018 | 2017 | % Change | | 2018 | 2017 | % Change |
|---|---|---|---|---|---|---|---|---|---|
| **Casualty** | | | | | | | | | |
| Commercial and personal umbrella | | $ | 76,527 | $ 70,463 | 8.6 % | $ | 60,601 | $ 57,438 | 5.5 % |
| General liability | | | 49,495 | 50,942 | (2.8) % | | 46,503 | 44,434 | 4.7 % |
| Commercial transportation | | | 47,190 | 38,755 | 21.8 % | | 39,823 | 41,496 | (4.0) % |
| Professional services | | | 44,511 | 43,017 | 3.5 % | | 39,669 | 39,242 | 1.1 % |
| Small commercial | | | 28,019 | 27,736 | 1.0 % | | 25,791 | 24,052 | 7.2 % |
| Executive products | | | 29,525 | 22,564 | 30.9 % | | 10,196 | 8,850 | 15.2 % |
| Medical professional liability | | | 12,689 | 12,107 | 4.8 % | | 8,834 | 8,556 | 3.2 % |
| Other casualty | | | 31,020 | 21,274 | 45.8 % | | 24,046 | 12,175 | 97.5 % |
| Total | | $ | 318,976 | $ 286,858 | 11.2 % | $ | 255,463 | $ 236,243 | 8.1 % |
| | | | | | | | | | |
| **Property** | | | | | | | | | |
| Commercial property | | $ | 60,217 | $ 48,036 | 25.4 % | $ | 34,807 | $ 31,591 | 10.2 % |
| Marine | | | 34,380 | 29,151 | 17.9 % | | 28,798 | 23,893 | 20.5 % |
| Specialty personal | | | 8,958 | 9,183 | (2.5) % | | 8,271 | 11,526 | (28.2) % |
| Property reinsurance | | | 23 | 615 | (96.3) % | | 26 | 3,262 | (99.2) % |
| Other property | | | 584 | 193 | - | | 470 | 18 | - |
| Total | | $ | 104,162 | $ 87,178 | 19.5 % | $ | 72,372 | $ 70,290 | 3.0 % |
| | | | | | | | | | |
| **Surety** | | | | | | | | | |
| Miscellaneous | | $ | 24,958 | $ 23,984 | 4.1 % | $ | 23,361 | $ 23,711 | (1.5) % |
| Commercial | | | 13,925 | 13,665 | 1.9 % | | 13,474 | 14,081 | (4.3) % |
| Contract | | | 15,643 | 15,173 | 3.1 % | | 13,358 | 14,231 | (6.1) % |
| Energy | | | 9,015 | 8,956 | 0.7 % | | 8,521 | 9,060 | (5.9) % |
| Total | | $ | 63,541 | $ 61,778 | 2.9 % | $ | 58,714 | $ 61,083 | (3.9) % |
| | | | | | | | | | |
| **Grand Total** | | $ | 486,679 | $ 435,814 | 11.7 % | $ | 386,549 | $ 367,616 | 5.2 % |

*Casualty*

Gross premiums written for the casualty segment in the first half of 2018 were up 11 percent, or $32.1 million, as most products posted top line growth. Growth was led by other casualty, which includes the general binding authority line and assumed reinsurance business with Prime. Gross premiums written for Prime have continued to grow and were up 33 percent for the first six months. The general binding authority business was launched at the beginning of 2017 and grew its top line by $4.1 million in the first half of 2018 when compared to the same period in 2017. Premiums for commercial transportation increased 22 percent, or $8.4 million, driven by both exposure growth and rate increases. The overall rate for commercial transportation was up 10 percent, after increasing by approximately the same amount in 2017. Our executive products group also made significant contributions, with both mature and newer product offerings, such as cyber liability coverages, driving exposure growth. New products, rate increases and exposure growth led to increased premium for commercial and personal umbrella. General liability decreased $1.4 million in the first half of 2018 due to intensifying competition.

*Property*

Gross premiums written for the Group's property segment were up $17.0 million for the first half of 2018 from the same period last year. The bulk of the growth was driven by commercial property, which was up 25 percent. Commercial property has posted increases in gross premiums written since the hurricane activity in the third quarter of 2017, as renewal rates for catastrophe prone wind exposures have improved. While rates have improved, the majority of the increase in gross premiums during the first half of 2018 was exposure driven. Our marine business was up 18 percent over the prior year due largely to exposure growth, though pricing has also improved slightly. Production from our specialty personal lines reflect increased performance from our Hawaii homeowners' product, but declined overall due to our previously announced exit from

recreational vehicles. Despite flat pricing for Hawaii homeowners' over the past year, gross premiums written were up 7 percent.

*Surety*

The surety segment recorded gross premiums written of $63.5 million for the first half of 2018, an increase of $1.8 million, or 3 percent, from the same period last year. All products grew during the first six months of the year, as an improving construction market aided growth and targeted initiatives on our miscellaneous surety product produced results.

**RLI Insurance Group**

Underwriting income for the Group totaled $31.6 million for the first half of 2018, compared to $32.8 million in the same period last year. Both periods reflect positive underwriting results for the current accident year and favorable reserve development on prior accident years. Favorable development on prior years' loss reserves was a larger benefit in 2018 as the results for 2017 were impacted by larger adverse development on transportation and medical professional liability within our casualty segment. The combined ratio for the Group totaled 91.8 in 2018, compared to 91.1 in 2017. The loss ratio increased slightly to 50.2 from 50.0 and the Group's expense ratio increased to 41.6 from 41.1.

| | For the Six-Month Periods Ended June 30, | |
| | 2018 | 2017 |
|---|---|---|
| **Underwriting income (in thousands)** | | |
| Casualty | $ 4,415 | $ 1,767 |
| Property | 9,529 | 11,667 |
| Surety | 17,689 | 19,366 |
| Total | $ 31,633 | $ 32,800 |
| | | |
| **Combined ratio** | | |
| Casualty | 98.3 | 99.3 |
| Property | 86.8 | 83.4 |
| Surety | 69.8 | 68.3 |
| Total | 91.8 | 91.1 |

*Casualty*

The casualty segment recorded underwriting income of $4.4 million in the first six months of 2018, compared to $1.8 million for the same period last year. The improved result for 2018 relates to increased favorable prior accident year's development, partially offset by an increase in the current accident year loss ratio. Favorable development on prior reserves improved net underwriting results for the casualty segment by $14.2 million in the first half of 2018, primarily on accident years 2015 through 2017. A majority of products developed favorably, with notable contributions from umbrella and general liability. Executive products and transportation were unfavorable. In comparison, $6.2 million of reserves were released in the first half of 2017, primarily related to general liability, executive products and umbrella, while transportation and medical professional liability developed adversely.

The combined ratio for the casualty segment was 98.3 for 2018, compared to 99.3 in 2017. The segment's loss ratio was 62.8 in 2018, down from 64.9 in 2017. The loss ratio decrease in 2018 was driven by the higher favorable development on prior years' reserves, despite a slightly higher current accident year loss ratio compared to 2017. The expense ratio for the casualty segment was 35.5, up from 34.4 for the same period last year, due to new business initiatives, investments in technology and a modest shift in mix towards products with higher acquisition rates.

*Property*

The property segment recorded underwriting income of $9.5 million for the first six months of 2018, compared to $11.7 million for the same period last year. Underwriting results for 2018 included $3.6 million of net favorable development on prior years' loss reserves, primarily from the marine business, $5.5 million of net losses from the volcanic activity in Hawaii and $3.0 million of storm losses. Comparatively, the 2017 underwriting results include $3.5 million of net favorable development on prior years' loss reserves, primarily from the marine business, and $2.4 million of net storm losses.

Underwriting results for the first half of 2018 translated into a combined ratio of 86.8, compared to 83.4 for the same period last year. The segment's loss ratio increased to 41.8 in 2018 from 37.0 in 2017, due to losses from the Hawaii volcanic activity. The segment's expense ratio decreased to 45.0 in 2018 from 46.4 in the prior year, due in part to the fixed nature of certain expenses and an increase in earned premium.

*Surety*

The surety segment recorded underwriting income of $17.7 million for the first six months of 2018, compared to $19.4 million for the same period last year. Both periods reflected positive current accident year underwriting performance and benefited from favorable development on prior years' loss reserves. Results for 2018 included favorable development on prior accident years' reserves across all surety lines, which improved net underwriting results for the segment by $7.8 million. Comparatively, 2017 results included favorable development on prior accident years' loss reserves across all products, which improved the segment's net underwriting results by $8.6 million.

The combined ratio for the surety segment totaled 69.8 for the first half of 2018, compared to 68.3 for the same period in 2017. The segment's loss ratio was 5.8 for 2018, compared to 7.4 for 2017. The loss ratio decrease was driven by a slightly lower current accident year loss ratio in 2018. The expense ratio was 64.0, up from 60.9 in the prior year, due to the decline in earned premium, increased investments in technology and a modest shift in mix towards miscellaneous surety, which has higher acquisition rates than some other lines.

**Investment Income and Realized Capital Gains**

Our investment portfolio generated net investment income of $28.8 million during the first half of 2018, an increase of 9.8 percent from that reported for the same period in 2017. The increase in investment income was due to an increased asset base and rising interest rates compared to the prior year period. On an after-tax basis, investment income increased by 18.4 percent, as lower tax rates also benefited income in 2018.

Yields on our fixed income investments for the first half of 2018 and 2017 were as follows:

|  | 2018 | 2017 |
|---|---|---|
| Pretax Yield |  |  |
| Taxable | 3.22 % | 3.18 % |
| Tax-Exempt | 2.68 % | 2.56 % |
| After-Tax Yield |  |  |
| Taxable | 2.54 % | 2.07 % |
| Tax-Exempt | 2.54 % | 2.42 % |

We recognized $29.3 million of realized gains in the first six months of 2018, compared to realized losses of $0.7 million in the same period of 2017. Realized gains in the equity portfolio of $34.5 million were partially offset by realized losses of $0.9 million in the fixed income portfolio as well as realized losses related to a non-cash impairment charge on goodwill and definite-lived intangibles. Equity portfolio rebalancing accounts for the higher amount of gains compared to that realized in the previous year.

The following table depicts the composition of our investment portfolio at June 30, 2018 as compared to December 31, 2017.

| (in thousands) | 6/30/2018 Financial Stmt Value | % | 12/31/2017 Financial Stmt Value | % |
|---|---|---|---|---|
| Fixed income | $ 1,710,612 | 78.9 % | $ 1,672,239 | 78.1 % |
| Equity securities | 386,603 | 17.8 % | 400,492 | 18.7 % |
| Other invested assets | 36,562 | 1.7 % | 33,808 | 1.6 % |
| Cash and short-term investments | 34,102 | 1.6 % | 34,251 | 1.6 % |
| Total | $ 2,167,879 | 100.0 % | $ 2,140,790 | 100.0 % |

We believe our overall asset allocation best meets our strategy to preserve capital for policyholders, provide sufficient income to support insurance operations, and to effectively grow book value over a long-term investment horizon.

The fixed income portfolio increased by $38.4 million in the first six months of 2018. The increase was primarily due to cash flows being allocated to the fixed income portfolio. Average fixed income duration was 4.8 years at June 30, 2018, reflecting our current liability structure and sound capital position. The equity portfolio decreased by $13.9 million during the first six months of 2018.

**Income Taxes**

Our effective tax rate for the six-month period ended June 30, 2018 was 15.7 percent, compared to 23.9 percent for the same period in 2017. The Tax Cuts and Jobs Act of 2017 (TCJA) lowered the federal corporate tax rate from 35 percent to 21 percent effective January 1, 2018, which accounts for the majority of the decrease in effective tax rate over the prior year. Effective rates are also dependent upon components of pretax earnings and the related tax effects. Tax favored investment activity was lower in 2018, which resulted in a lower spread between the corporate rate and effective rate when compared to 2017. This impact was partially offset by lower pretax earnings in 2018.

**Three Months Ended June 30, 2018 Compared to Three Months Ended June 30, 2017**

Consolidated revenue for the second quarter of 2018 increased $23.1 million, or 12 percent, from the same period in 2017. Net premiums earned for the Group increased 7 percent, driven by growth from our casualty and property segments, while investment income increased 10 percent due to an increased asset base. Realized gains during the quarter were $20.8 million, compared to $1.4 million of realized losses in 2017. The 2018 gain was comprised of $21.7 million of realized gains on equity securities from rebalancing the portfolio and $0.9 million of realized losses on the fixed income portfolio. This compares to realized gains of $1.1 million on the equity portfolio, $0.6 million of realized gains on the fixed income portfolio and $3.4 million of realized losses from a non-cash impairment charge on goodwill and intangible assets in 2017. These increases were partially offset by the $12.6 million of net unrealized losses on equity securities, which are required to be recognized in earnings for 2018 and forward due to the adoption of ASU 2016-01. Prior to 2018, unrealized gains and losses on equity securities were recognized through other comprehensive earnings.

|  | For the Three-Month Periods Ended June 30, | | | |
|---|---|---|---|---|
|  | 2018 | | 2017 | |
| **Consolidated revenues (in thousands)** | | | | |
| Net premiums earned | $ | 196,522 | $ | 184,331 |
| Net investment income | | 14,577 | | 13,238 |
| Net realized gains (losses) | | 20,849 | | (1,359) |
| Net unrealized losses on equity securities | | (12,611) | | - |
| Total consolidated revenue | $ | 219,337 | $ | 196,210 |

Net after-tax earnings for the second quarter of 2018 totaled $33.3 million, compared to $26.2 million for the same period last year. The increase in earnings for 2018 was attributable to the $16.5 million of after tax realized gains compared to $0.9 million of after tax realized losses in 2017. The $10.0 million of unrealized losses on equity securities, net of tax, recognized in net earnings partially offset the impact of the realized gains. In 2017, unrealized activity on equity securities were recognized through other comprehensive earnings. Underwriting results for both periods reflect profitable current accident year results and favorable development from prior years' loss reserves. Favorable development on prior years' loss reserves provided additional pretax earnings of $14.6 million in the second quarter of 2018 compared to $15.1 million in 2017. The volcanic activity in Hawaii drove an increase in total catastrophe loss for the second quarter, with $8.0 million of total catastrophe losses in 2018, compared to $3.0 million in 2017. Bonus and profit sharing-related expenses associated with the net impact of prior years' reserve development and catastrophe losses totaled $1.0 million in 2018, compared to $1.8 million in 2017. These performance-related expenses affected policy acquisition, insurance operating and general corporate expenses. Bonus and profit-sharing amounts earned by executives, managers and associates are predominantly influenced by corporate performance including operating earnings, combined ratio and return on capital.

During the second quarter of 2018, equity in earnings of unconsolidated investees totaled $7.1 million. This amount includes $6.6 million from Maui Jim and $0.5 million from Prime. Comparatively, the second quarter of 2017 reflected $6.8 million of earnings, including $6.2 million from Maui Jim and $0.6 million from Prime. In addition, net earnings for the quarter benefited from a lower effective tax rate, 16 percent in 2018 compared to 23 percent in 2017, resulting from the Tax

Cuts and Jobs Act of 2017 (TCJA), which reduced the corporate tax rate from 35 percent to 21 percent beginning January 1, 2018.

Comprehensive earnings totaled $25.6 million for the second quarter of 2018, compared to $36.8 million for the second quarter of 2017. Other comprehensive earnings primarily included after-tax unrealized gains and losses from the fixed income portfolio in 2018 and after-tax unrealized gains and losses from both the fixed income and equity portfolios in 2017. The second quarter's $7.7 million other comprehensive loss was due to unrealized losses on the fixed income portfolio as interest rates rose during the quarter. This compares to $10.6 million of other comprehensive earnings for the same period in 2017, as equity market returns were strong and interest rates declined slightly.

**RLI Insurance Group**

Gross premiums written for the Group increased $28.9 million, or 12 percent, for the second quarter of 2018 when compared to 2017. The majority of our products contributed to growth in the period, with the bulk of the increase driven by products in our casualty and property segments. Net premiums earned increased $12.2 million, or 7 percent, also driven by products in our casualty and property segments.

| | **Gross Premiums Written** | | | **Net Premiums Earned** | | |
|---|---|---|---|---|---|---|
| | For the Three-Month Periods Ended June 30, | | | For the Three-Month Periods Ended June 30, | | |
| (in thousands) | 2018 | 2017 | % Change | 2018 | 2017 | % Change |
| **Casualty** | | | | | | |
| Commercial and personal umbrella | $ 42,194 | $ 39,551 | 6.7 % | $ 30,649 | $ 28,861 | 6.2 % |
| General liability | 28,207 | 31,343 | (10.0) % | 23,338 | 22,851 | 2.1 % |
| Commercial transportation | 28,774 | 23,143 | 24.3 % | 20,648 | 20,395 | 1.2 % |
| Professional services | 24,030 | 22,939 | 4.8 % | 19,846 | 20,016 | (0.8) % |
| Small commercial | 14,872 | 14,682 | 1.3 % | 12,901 | 11,765 | 9.7 % |
| Executive products | 16,525 | 12,729 | 29.8 % | 5,144 | 4,438 | 15.9 % |
| Medical professional liability | 7,668 | 5,410 | 41.7 % | 4,362 | 4,265 | 2.3 % |
| Other casualty | 16,251 | 10,227 | 58.9 % | 12,725 | 6,668 | 90.8 % |
| Total | $ 178,521 | $ 160,024 | 11.6 % | $ 129,613 | $ 119,259 | 8.7 % |
| | | | | | | |
| **Property** | | | | | | |
| Commercial property | $ 34,908 | $ 29,617 | 17.9 % | $ 17,856 | $ 15,873 | 12.5 % |
| Marine | 18,253 | 15,614 | 16.9 % | 14,941 | 11,607 | 28.7 % |
| Specialty personal | 4,811 | 4,523 | 6.4 % | 4,129 | 5,508 | (25.0) % |
| Property reinsurance | 13 | 210 | (93.8) % | 14 | 1,479 | (99.1) % |
| Other property | 270 | 135 | 100.0 % | 250 | 18 | - |
| Total | $ 58,255 | $ 50,099 | 16.3 % | $ 37,190 | $ 34,485 | 7.8 % |
| | | | | | | |
| **Surety** | | | | | | |
| Miscellaneous | $ 12,343 | $ 11,823 | 4.4 % | $ 11,719 | $ 11,854 | (1.1) % |
| Commercial | 6,413 | 6,183 | 3.7 % | 6,761 | 6,938 | (2.6) % |
| Contract | 9,450 | 8,028 | 17.7 % | 7,012 | 7,147 | (1.9) % |
| Energy | 4,833 | 4,781 | 1.1 % | 4,227 | 4,648 | (9.1) % |
| Total | $ 33,039 | $ 30,815 | 7.2 % | $ 29,719 | $ 30,587 | (2.8) % |
| | | | | | | |
| **Grand Total** | $ 269,815 | $ 240,938 | 12.0 % | $ 196,522 | $ 184,331 | 6.6 % |

*Casualty*

Gross premiums written for the casualty segment in the second quarter of 2018 were up 12 percent, or $18.5 million, as most products posted top line growth. Growth was led by other casualty, which includes the general binding authority line and assumed reinsurance business with Prime. General binding authority business was launched at the beginning of 2017 and grew its top line by $2.1 million in the second quarter of 2018 when compared to the same period in 2017. Gross premiums written for Prime have continued to grow and were up 45 percent for the quarter. Premiums for commercial transportation increased 24 percent, or $5.6 million in the quarter, driven by both exposure growth and rate increases. Rates across all classes within our

Table of Contents

commercial transportation business were up 10 percent in total, after increasing by approximately the same amount in each quarter since the beginning of 2017. Our executive products group also made significant contributions during the quarter with both mature and newer product offerings, such as cyber liability coverages, driving exposure growth. Exposure growth from mature lines, newer products and rate increases led to increased premium for commercial and personal umbrella. Medical professional liability also increased in the second quarter, while general liability decreased $3.1 million due to intensifying competition.

*Property*

Gross premiums written for the Group's property segment totaled $58.3 million for the second quarter of 2018, up 16 percent from the same period last year. The bulk of the growth was driven by commercial property, which was up 18 percent. This marked the third consecutive quarter commercial property has posted an increase in gross premiums written, as renewal rates for catastrophe prone wind exposures have continued to improve following hurricane activity in the third quarter of 2017. While rates have improved relative to prior quarters, the majority of the increase in gross premiums during the quarter was exposure driven. Our marine business was up 17 percent in the quarter due largely to exposure growth, though pricing has also improved slightly. Production from specialty personal reflects increased performance from our Hawaii homeowners' product, which was up 7 percent.

*Surety*

The surety segment recorded gross premiums written of $33.0 million for the second quarter of 2018, an increase of $2.2 million, or 7 percent, from the same period last year. Despite competitive market conditions each of our surety products posted growth during the quarter. Miscellaneous and contract surety were responsible for the majority of the increase as a result of an improving construction market and targeted initiatives.

**RLI Insurance Group**

Underwriting income for the Group totaled $14.1 million for the second quarter of 2018, compared to $19.7 million in the same period last year. Both periods reflect positive underwriting results for the current accident year and similar amounts of favorable reserve development on prior accident years. The combined ratio for the Group totaled 92.8 in 2018, compared to 89.3 in 2017. The loss ratio increased to 51.7 from 49.0, due largely to losses associated with the volcanic activity in Hawaii. The Group's expense ratio increased to 41.1 from 40.3.

| | For the Three-Month Periods Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | 2018 | | 2017 | |
| **Underwriting income (in thousands)** | | | | |
| Casualty | $ | 2,854 | $ | 8,648 |
| Property | | 3,647 | | 2,863 |
| Surety | | 7,645 | | 8,232 |
| Total | $ | 14,146 | $ | 19,743 |
| | | | | |
| **Combined ratio** | | | | |
| Casualty | | 97.8 | | 92.8 |
| Property | | 90.2 | | 91.7 |
| Surety | | 74.3 | | 73.1 |
| Total | | 92.8 | | 89.3 |

*Casualty*

The casualty segment recorded underwriting income of $2.9 million in the second quarter of 2018, compared to $8.6 million for the same period last year. Underwriting results for 2018 reflect an increase in the current accident year loss ratio and a smaller amount of favorable development on prior accident year reserves. Favorable development on prior reserves improved net underwriting results for the casualty segment by $7.1 million in the second quarter of 2018, primarily on accident years 2015 through 2017. A majority of products developed favorably, with notable contributions from umbrella and the executive products group. Transportation and professional services were unfavorable. In comparison, $9.3 million of reserves were realized in the second quarter of 2017, largely driven by umbrella, general liability and professional services.

The combined ratio for the casualty segment was 97.8 for 2018, compared to 92.8 in 2017. The segment's loss ratio was 62.8 in 2018, up from 59.4 in 2017. The loss ratio increased in 2018 as a result of the higher current accident year loss ratio and lower favorable development on prior years' reserves. The expense ratio for the casualty segment was 35.0, up from 33.4 for the same period last year, due to new business initiatives, investments in technology and a modest shift in mix towards products with higher acquisition rates.

*Property*

The property segment recorded underwriting income of $3.6 million for the second quarter of 2018, compared to $2.9 million for the same period last year. Underwriting income reflects improved current accident year performance over that obtained in 2017. Underwriting results for 2018 included $2.8 million of net favorable development on prior years' loss and catastrophe reserves, primarily from the marine business, $5.5 million of net losses from the volcanic activity in Hawaii and $1.1 million of net storm losses. Comparatively, the 2017 underwriting results include $1.5 million of net favorable development on prior years' loss and catastrophe reserves, primarily from the marine business, and $2.4 million of net storm losses.

Underwriting results for the second quarter of 2018 translated into a combined ratio of 90.2, compared to 91.7 for the same period last year. The segment's loss ratio increased to 46.1 in 2018 from 45.5 in 2017, primarily as a result of the Hawaii volcanic activity losses. The segment's expense ratio decreased to 44.1 in 2018 from 46.2 in the prior year, due in part to the fixed nature of certain expenses and an increase in earned premium.

*Surety*

The surety segment recorded underwriting income of $7.6 million for the second quarter of 2018, compared to $8.2 million for the same period last year. Both periods reflected positive current accident year underwriting performance and benefited from favorable development on prior years' loss reserves. Results for 2018 included favorable development on prior accident years' reserves across all surety lines, which improved net underwriting results for the segment by $2.8 million. Comparatively, 2017 results included favorable development on prior accident years' loss reserves across all products, which improved the segment's net underwriting results by $2.7 million.

The combined ratio for the surety segment totaled 74.3 for the second quarter of 2018, compared to 73.1 for the same period in 2017. The segment's loss ratio was 10.3 for 2018, compared to 12.6 for 2017. The loss ratio decrease was driven by a slightly lower current accident year loss ratio in 2018. The expense ratio was 64.0, up from 60.5 in the prior year, due to the decline in earned premium, increased investments in technology and a modest shift in mix towards contract surety, which has higher acquisition rates than some other lines.

**Investment Income and Realized Capital Gains**

Our investment portfolio generated net investment income of $14.6 million during the second quarter of 2018, an increase of 10.1 percent from that reported for the same period in 2017. The increase in investment income was due to an increased asset base and rising interest rates compared to the prior year period. On an after-tax basis, investment income increased by 17.8 percent, as lower tax rates also benefited income in 2018.

Yields on our fixed income investments for the second quarter of 2018 and 2017 were as follows:

|  | 2Q 2018 | 2Q 2017 |
|---|---|---|
| Pretax Yield | | |
| Taxable | 3.19 % | 3.18 % |
| Tax-Exempt | 2.85 % | 2.53 % |
| After-Tax Yield | | |
| Taxable | 2.52 % | 2.07 % |
| Tax-Exempt | 2.70 % | 2.40 % |

We recognized $20.8 million of realized gains in the second quarter of 2018, compared to realized losses of $1.4 million in the same period of 2017. Realized gains in the equity portfolio of $21.7 million were partially offset by realized losses of $0.9 million in the fixed income portfolio. Equity portfolio rebalancing accounts for the higher amount of gains compared to that realized in the previous year.

Table of Contents

### Income Taxes

Our effective tax rate for the second quarter of 2018 was 16.0 percent, compared to 23.0 percent for the same period in 2017. The Tax Cuts and Jobs Act of 2017 (TCJA) lowered the federal corporate tax rate from 35 percent to 21 percent effective January 1, 2018, which accounts for the majority of the decrease in effective tax rate over the prior year. Effective rates are also dependent upon components of pretax earnings and the related tax effects. Tax favored investment activity and the excess tax benefit on share-based compensation was lower in 2018, which resulted in a lower spread between the corporate rate and effective rate when compared to 2017. This impact was amplified by higher pretax earnings in 2018.

### LIQUIDITY AND CAPITAL RESOURCES

We have three primary types of cash flows: (1) cash flows from operating activities, which consist mainly of cash generated by our underwriting operations and income earned on our investment portfolio, (2) cash flows from investing activities related to the purchase, sale and maturity of investments, and (3) cash flows from financing activities that impact our capital structure, such as shareholder dividend payments and changes in debt and shares outstanding.

The following table summarizes cash flows provided by (used in) our activities for the six-month periods ended June 30, 2018 and 2017:

| (in thousands) | 2018 | | 2017 | |
|---|---|---|---|---|
| Operating cash flows | $ | 100,000 | $ | 74,570 |
| Investing cash flows | $ | (74,888) | $ | (57,242) |
| Financing cash flows | $ | (15,281) | $ | (14,242) |
| Total | $ | 9,831 | $ | 3,086 |

Operating activities generated positive cash flows of $100.0 million in the first half of 2018, compared to $74.6 million in the same period last year. The increase in operating cash flows was due to an increase in written premium and associated receipts, while claim payments only increased by a marginal amount.

We have $149.0 million in debt outstanding. On October 2, 2013, we completed a public debt offering, issuing $150.0 million in senior notes maturing September 15, 2023 (a 10-year maturity), and paying interest semi-annually at the rate of 4.875 percent per annum. The notes were issued at a discount resulting in proceeds, net of discount and commission, of $148.6 million. The estimated fair value for the senior note at June 30, 2018 was $153.6 million. The fair value of our debt is estimated based on the limited observable prices that reflect thinly traded securities.

As of June 30, 2018, we had cash and other investments maturing within one year of approximately $71.9 million and an additional $349.6 million maturing between one to five years. Whereas our strategy is to be fully invested at all times, short-term investments in excess of demand deposit balances are considered a component of investment activities, and thus are classified as investments in our consolidated balance sheets.

We also maintain a revolving line of credit with JP Morgan Chase Bank N.A., which permits us to borrow up to an aggregate principal amount of $50.0 million. This facility was entered into during the second quarter of 2018 and replaced the previous $40.0 million facility which expired on May 28, 2018. Under certain conditions, the line may be increased up to an aggregate principal amount of $75.0 million. The facility has a two-year term that expires on May 24, 2020. As of and during the six-month period ended June 30, 2018, no amounts were outstanding on this facility.

Additionally, two of our insurance companies, RLI Ins. and Mt. Hawley, are members of the Federal Home Loan Bank of Chicago (FHLBC). Membership in the Federal Home Loan Bank System provides both companies access to an additional source of liquidity via a secured lending facility. Our membership allows each insurance subsidiary to determine tenor and structure at the time of borrowing. As of and during the six-month period ended June 30, 2018, there were no outstanding borrowing amounts with the FHLBC.

We believe that cash generated by operations and investments will provide sufficient sources of liquidity to meet our anticipated needs over the next 12 to 24 months. In the event they are not sufficient, we believe cash available from financing activities and other sources will provide sufficient additional liquidity.

We have not had any liquidity issues affecting our operations as we have sufficient cash flow to support operations. In addition to our bank credit facility and FHLBC membership, our highly liquid investment portfolio provides an additional source of liquidity.

We maintain a diversified investment portfolio representing policyholder funds that have not yet been paid out as claims, as well as the capital we hold for our shareholders. As of June 30, 2018, our investment portfolio had a balance sheet value of $2.2 billion. Invested assets at June 30, 2018 have increased $27.1 million from December 31, 2017.

As of June 30, 2018, our investment portfolio had the following asset allocation breakdown:

**Portfolio Allocation**
**(in thousands)**

| Asset class | Cost or Amortized Cost | Fair Value | Unrealized Gain/(Loss) | % of Total Fair Value | Quality* |
|---|---|---|---|---|---|
| U.S. government | $ 151,446 | $ 149,165 | $ (2,281) | 6.9 % | AAA |
| U.S. agency | 30,650 | 30,256 | (394) | 1.4 % | AAA |
| Non-U.S. govt. & agency | 8,186 | 7,895 | (291) | 0.4 % | BBB+ |
| Agency MBS | 364,298 | 354,345 | (9,953) | 16.3 % | AAA |
| ABS/CMBS** | 101,075 | 100,194 | (881) | 4.6 % | AAA |
| Corporate | 633,159 | 624,686 | (8,473) | 28.8 % | BBB+ |
| Municipal | 438,261 | 444,071 | 5,810 | 20.5 % | AA |
| **Total Fixed Income** | **$ 1,727,075** | **$ 1,710,612** | **$ (16,463)** | **78.9 %** | **AA-** |
| **Equity** | **$ 207,214** | **$ 386,603** | **$ 179,389** | **17.8 %** | |
| **Other Invested Assets** | **$ 36,707** | **$ 36,562** | **$ (145)** | **1.7 %** | |
| **Cash and Short-Term Investments** | **$ 34,102** | **$ 34,102** | **$ —** | **1.6 %** | |
| **Total Portfolio** | **$ 2,005,098** | **$ 2,167,879** | **$ 162,781** | **100.0 %** | |

*Quality ratings provided by Moody's and S&P
**Asset-backed and commercial mortgage-backed securities

Our investment portfolio does not have any exposure to derivatives.

As of June 30, 2018, our fixed income portfolio had the following rating distribution:

| | |
|---|---|
| AAA | 43.1 % |
| AA | 20.0 % |
| A | 19.4 % |
| BBB | 11.2 % |
| BB | 3.6 % |
| B | 2.4 % |
| CCC | 0.1 % |
| NR | 0.2 % |
| Total | 100.0 % |

As of June 30, 2018, the duration of the fixed income portfolio was 4.8 years. Our fixed income portfolio remained well diversified, with 1,262 individual issues.

Our investment portfolio has limited exposure to structured asset-backed securities (ABS). As of June 30, 2018, we had $73.3 million in ABS which are pools of assets collateralized by cash flows from several types of loans, including home equity, credit cards, autos and similar obligations.

As of June 30, 2018, we had $26.9 million in commercial mortgage backed securities (CMBS) and $354.3 million in mortgage backed securities backed by government sponsored enterprises (GSEs - Freddie Mac, Fannie Mae and Ginnie Mae). Excluding the GSE backed MBS, our exposure to ABS and CMBS was 4.6 percent of our investment portfolio at quarter end.

We had $624.7 million in corporate fixed income securities as of June 30, 2018, which includes $73.0 million invested in a high yield credit strategy. This portfolio consists of floating rate bank loans and bonds that are below investment grade in credit quality and offer incremental yield over our core fixed income portfolio.

We also maintain an allocation to municipal fixed income securities. As of June 30, 2018, we had $444.1 million in municipal securities. Approximately 87 percent of our municipal bond portfolio maintains an 'AA' or better rating, while 99 percent of the municipal bond portfolio is rated 'A' or better.

Our equity portfolio had a fair value of $386.6 million as of June 30, 2018 and is also a source of liquidity. The securities within the equity portfolio remain primarily invested in large-cap issues with strong dividend performance. In the equity portfolio, the strategy remains one of value investing, with security selection taking precedence over market timing. We use a buy-and-hold strategy, minimizing both transactional costs and payment of taxes.

As of June 30, 2018, our equity portfolio had a dividend yield of 2.4 percent, compared to 1.9 percent for the S&P 500 index. Because of the corporate dividend-received-deduction applicable to our dividend income, we pay an effective tax rate of 13.1 percent on dividends, compared to 21.0 percent on taxable interest and 5.3 percent on municipal bond interest income. The equity portfolio is managed in a diversified and granular manner, with 81 individual securities and no single stock exposure greater than 2 percent of the equity portfolio.

We had $36.6 million of other invested assets at June 30, 2018, including investments in low income housing tax credit partnerships, membership in the Federal Home Loan Bank of Chicago (FHLBC) and investments in private funds. As of June 30, 2018, $16.8 million of investments were pledged as collateral with the FHLBC to ensure timely access to the secured lending facility that ownership of FHLBC stock provides. As of and during the six month period ending June 30, 2018, there were no outstanding borrowings with the FHLBC.

Our capital structure is comprised of equity and debt outstanding. As of June 30, 2018, our capital structure consisted of $149.0 million in 10-year maturity senior notes maturing in 2023 (debt) and $849.8 million of shareholders' equity. Debt outstanding comprised 14.9 percent of total capital as of June 30, 2018. Interest and fees on debt obligations totaled $3.7 million during the half of 2018, the same amount as the previous year. We have incurred interest expense on debt at an average annual interest rate of 4.91 percent for the six-month periods ended June 30, 2018 and 2017.

We paid a quarterly cash dividend of $0.22 per share on June 20, 2018, a $0.01 increase over the prior quarter. We have paid dividends for 168 consecutive quarters and increased dividends in each of the last 43 years.

Our three insurance subsidiaries are subsidiaries of RLI Corp, with RLI Ins. as the first-level, or principal, insurance subsidiary. At the holding company (RLI Corp.) level, we rely largely on dividends from our insurance company subsidiaries to meet our obligations for paying principal and interest on outstanding debt, corporate expenses and dividends to RLI Corp. shareholders. As discussed further below, dividend payments to RLI Corp. from our principal insurance subsidiary are restricted by state insurance laws as to the amount that may be paid without prior approval of the insurance regulatory authorities of Illinois. As a result, we may not be able to receive dividends from such subsidiary at times and in amounts necessary to pay desired dividends to RLI Corp. shareholders. On a GAAP basis, as of June 30, 2018, our holding company had $849.8 million in equity. This includes amounts related to the equity of our insurance subsidiaries, which is subject to regulatory restrictions under state insurance laws. The unrestricted portion of holding company net assets is comprised primarily of investments and cash, including $10.7 million in liquid assets, which approximates a quarter of our annual holding company expenditures. Unrestricted funds at the holding company are available to fund debt interest, general corporate obligations and dividend payments to our shareholders. If necessary, the holding company also has other potential sources of liquidity that could provide for additional funding to meet corporate obligations or pay shareholder dividends, which include a revolving line of credit, as well as access to capital markets.

Ordinary dividends, which may be paid by our principal insurance subsidiary without prior regulatory approval, are subject to certain limitations based upon statutory income, surplus and earned surplus. The maximum ordinary dividend distribution from our principal insurance subsidiary in a rolling 12-month period is limited by Illinois law to the greater of 10 percent of RLI Ins. policyholder surplus, as of December 31 of the preceding year, or the net income of RLI Ins. for the 12-month period ending December 31 of the preceding year. Ordinary dividends are further restricted by the requirement that they be paid from earned surplus. Any dividend distribution in excess of the ordinary dividend limits is deemed extraordinary and requires prior approval from the Illinois Department of Insurance (IDOI). RLI Ins. did not pay any dividends to RLI Corp in the first six months of 2018. In 2017, our principal insurance subsidiary paid ordinary dividends totaling $107.0 million to RLI

Table of Contents

Corp. No extraordinary dividends were paid during 2018 or 2017. As of June 30, 2018, $0.6 million of the net assets of our principal insurance subsidiary are not restricted and could be distributed to RLI Corp. as ordinary dividends. Because the limitations are based upon a rolling 12-month period, the presence, amount and impact of these restrictions vary over time. Furthermore, in addition to the unrestricted liquid net assets that RLI Corp. had on hand as of June 30, 2018, RLI Corp. has access to lines of credit that would cover normal annual holding company expenditures as they are incurred and become payable.

**ITEM 3. Quantitative and Qualitative Disclosures about Market Risk**

Market risk is the risk of economic losses due to adverse changes in the estimated fair value of a financial instrument as the result of changes in equity prices, interest rates, foreign currency exchange rates and commodity prices. Historically, our primary market risks have been equity price risk associated with investments in equity securities and interest rate risk associated with investments in fixed maturities. We have limited exposure to both foreign currency risk and commodity risk.

Credit risk is the potential loss resulting from adverse changes in an issuer's ability to repay its debt obligations. We monitor our portfolio to ensure that credit risk does not exceed prudent levels. We have consistently invested in high credit quality, investment grade securities. Our fixed maturity portfolio has an average rating of "AA-," with 83 percent rated "A" or better by at least two nationally recognized rating organizations.

On an overall basis, our exposure to market risk has not significantly changed from that reported in our December 31, 2017 Annual Report on Form 10-K.

**ITEM 4. Controls and Procedures**

We maintain a system of controls and procedures designed to provide reasonable assurance as to the reliability of the financial statements and other disclosures included in this report, as well as to safeguard assets from unauthorized use or disposition. An evaluation of the effectiveness of the design and operation of our disclosure controls and procedures was performed, under the supervision and with the participation of management, including our Chief Executive Officer and Chief Financial Officer, as of the end of the period covered by this report. Based upon that evaluation, the Chief Executive Officer and Chief Financial Officer have concluded that these disclosure controls and procedures are effective, as of the end of the period covered by this report.

In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurances of achieving the desired control objective, and management necessarily is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures. We believe that our disclosure controls and procedures provide such reasonable assurance.

No changes were made to our internal control over financial reporting during the last fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

**PART II - OTHER INFORMATION**

**Item 1.     Legal Proceedings** –

The information in response to this item is incorporated herein by reference to note 8 to the unaudited condensed consolidated interim financial statements, "Contingent Liabilities."

**Item 1A.    Risk Factors -** There were no material changes to report.

**Item 2.     Unregistered Sales of Equity Securities and Use of Proceeds  -**

Items 2(a) and (b) are not applicable.

In 2010, our Board of Directors implemented a $100 million share repurchase program. We did not repurchase any shares during 2018. We have $87.5 million of remaining capacity from the repurchase program. The repurchase program may be suspended or discontinued at any time without prior notice.

**Item 3.      Defaults Upon Senior Securities -** Not Applicable.

**Item 4.**  **Mine Safety Disclosures -** Not Applicable.

**Item 5.**  **Other Information -** Not Applicable.

**Item 6.**  **Exhibits**

Exhibit 10.1    RLI Corp. Nonemployee Directors' Deferred Compensation Plan, as amended

Exhibit 31.1    Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

Exhibit 31.2    Certification Pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

Exhibit 32.1    Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

Exhibit 32.2    Certification Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002

Exhibit 101    XBRL-Related Documents

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

RLI Corp.

/s/Thomas L. Brown
Thomas L. Brown
Senior Vice President, Chief Financial Officer
(Principal Financial and Chief Accounting Officer)

Date: July 20, 2018

38

(Back To Top)

# Section 2: EX-10.1 (EX-10.1)

**Exhibit 10.1**

**RLI CORP.**

**NONEMPLOYEE DIRECTORS**

**DEFERRED COMPENSATION PLAN**

**(Restated as of January 1, 2009)**

**(Amended May 3, 2018)**

**RLI CORP.**

**NONEMPLOYEE DIRECTORS
DEFERRED COMPENSATION PLAN**

**ARTICLE 1**

**INTRODUCTION**

**1.1.**        **Establishment**.  RLI established the RLI Corp. Nonemployee Directors Deferred Compensation Plan ("Plan") effective January 1, 2005.  Prior to that date, RLI provided similar deferred compensation opportunities to its Directors under certain Prior Agreements.  All obligations under the Prior Agreements (including any predecessor arrangements) will be satisfied under the Prior Agreements, rather than under this Plan.  RLI restated the Plan, effective January 1, 2009, to comply with the requirements of the final regulations issued under Section 409A of the Code ("Section 409A") ("Restatement").  RLI amended the Plan, effective May 3, 2018, to clarify provisions with respect to the deferral of restricted stock units and to make clear how partial (or fractional) shares are paid in a single or final payment.

The Restatement applies to amounts deferred under the Plan on or after January 1, 2009 (the "Restatement Date"), and to the payment of all amounts deferred under the Plan (whether such amounts were deferred before, on, or after the Restatement Date) that have not yet been distributed as of the Restatement Date.  Except as set forth in Article 6, no amount deferred under the Plan is intended to be "grandfathered" under Section 409A.

The obligation of RLI to make payments under the Plan constitutes an unsecured (but legally enforceable) promise of RLI to make such payments and no person, including any Participant or Beneficiary, shall have any lien, prior claim or other security interest in any property of RLI as a result of the Plan.

**1.2.**        **Purpose**.  The purpose of the Plan is to attract and retain qualified Directors and to provide them with an opportunity to save on a pre-tax basis and accumulate tax-deferred income to achieve their financial goals.

**1.3.**        **Definitions**.  When the following terms are used herein with initial capital letters, they shall have the following meanings:

**1.3.1.**        **Account -** the separate recordkeeping account (unfunded and unsecured) maintained for each Participant in connection with the Participant's participation in the Plan.

**1.3.2.**        **Affiliate -** a business entity which is under a "common control" with RLI or which is a member of an "affiliated service group" that includes RLI, as those terms are defined in Code § 414(b), (c) and (m).

**1.3.3.**        **Beneficiary -** the person or persons designated as such under Sec. 5.2.

**1.3.4**.        **Board -** the Board of Directors of RLI.

**1.3.5.**        **Code -** the Internal Revenue Code of 1986, as the same may be amended from time to time.

**1.3.6.**        **Direct Compensation -** the total amounts, as determined by RLI, payable to a Director for services as a Director, whether payable in cash or in RLI Stock (including restricted stock unit awards), but excluding amounts determined by RLI to be expense reimbursements.

**1.3.7.**        **Director -** an individual who is a member of the Board but who is not an Employee of RLI or an Affiliate.

**1.3.8.**        **Employee -** a common-law employee of RLI or an Affiliate (while it is an Affiliate).

**1.3.9.   ERISA -** the Employee Retirement Income Security Act of 1974, as the same may be amended from time to time.

**1.3.10.   Participant -** a Director who enrolls as a Participant in the Plan under Sec. 2.2.

**1.3.11.   Plan -** the unfunded deferred compensation plan that is set forth in this document, as the same may be amended from time to time.  The name of the Plan is the "RLI Corp. Nonemployee Directors Deferred Compensation Plan."

**1.3.12.   Prior Agreement -** an individual agreement entered into by a Director and RLI to provide deferred compensation opportunities to the Director.  In certain cases, such Prior Agreement was a successor to an earlier arrangement known as the Director Non-Qualified Deferred Compensation Plan.

**1.3.13.   RLI -** RLI Corp. and any Successor Corporation.

**1.3.14.   RLI Stock -** the common stock of RLI.

**1.3.15.   Successor Corporation -** any entity that succeeds to the business of RLI through merger, consolidation, acquisition of all or substantially all of its assets, or any other means and which elects before or within a reasonable time after such succession, by appropriate action evidenced in writing, to continue the Plan.

**1.3.16.   Termination of Service -** the Participant's departure from the Board, unless the Director then becomes an Employee.  Notwithstanding the foregoing, a "Termination of Service" will be deemed not to have occurred if such departure would not be considered a "separation from service" under Code § 409A (a) (2) (A) (i) or any regulations or other guidance issued by the Treasury Department under Code § 409A.  In such case, a Termination of Service will be deemed to have occurred at the earliest time allowed under Code § 409A.

**1.3.17.   Vested -** nonforfeitable.

**1.3.18.   Year -** the calendar year.

**1.4.      Nonqualified Deferred Compensation**.  The Plan is a nonqualified deferred compensation plan subject to Code § 409A.  To the extent any provision of the Plan does not satisfy the requirements contained in Code § 409A or in any regulations or other guidance issued by the Treasury Department under Code § 409A, such provision will be applied in a manner consistent with such requirements, regulations or guidance, notwithstanding any contrary provision of the Plan or any inconsistent election made by a Participant.

## ARTICLE 2

## PARTICIPATION

**2.1.      Eligibility**.  All Directors will be eligible to participate in the Plan.  A Director may continue to participate in the Plan for so long as the Plan remains in effect and remains a Director.

**2.2.      Enrollment**.  A Director will be allowed to enroll in the Plan during the thirty (30) day period coinciding with and following the date the individual becomes a Director.  Such an enrollment will be effective as of the date it is made.  Thereafter, a Director may elect to enroll for a Year during the enrollment period established by RLI for such Year, which enrollment period will be a period of not less than thirty (30) days that ends not later than the last day of the prior Year.  Enrollment must be made in such manner and in accordance with such rules as may be prescribed for this purpose by RLI (including by means of a voice response or other electronic system under circumstances authorized by RLI).

**2.3.      Direct Compensation Deferrals**.

**2.3.1.   Elections**.  A Director may elect to reduce any annual retainers, committee fees, and, if applicable, committee chair fees earned in the applicable Year ("Direct Compensation") by any whole percent, but not more than

one-half in cash and one-half in RLI Stock or in some other proportion, as RLI may specify, to the portion of Direct Compensation that is payable in cash and to the portion that is payable in RLI Stock. A Director may separately elect to defer the receipt of RLI Stock otherwise issuable upon the vesting of any restricted stock unit awards that are granted to such Director in the applicable Year, and such election shall apply to all Years over which such restricted stock award vests. An election must be made in such manner and in accordance with such rules as may be prescribed for this purpose by RLI (including by means of a voice response or other electronic system under circumstances authorized by RLI). An election must be made as part of the enrollment described in Sec. 2.2.

> **2.3.2.** **Elections Relate to Services Performed After the Election and Are Irrevocable.** An election will apply to all Direct Compensation attributable to services performed in a given Year, regardless of when such Direct Compensation would otherwise be provided to the Participant. For example, an election to defer an annual retainer attributable to services performed in a given Year but payable in the next Year, must be made as part of the enrollment election made prior to the Year in which the services are performed. However, an election will only be effective to defer Direct Compensation earned after the election is made, and not before. For example, an election made in connection with a mid-year enrollment under Sec. 2.2 will only be effective for Direct Compensation attributable to services performed on and after the effective date of the enrollment as provided in Sec. 2.2. An election to defer the shares of RLI Stock otherwise issuable upon the vesting of a restricted stock unit award will apply only to restricted stock unit awards granted in the applicable Year. An election will apply solely with respect to the given Year - that is, an election will not automatically be carried over and applied to the next Year.

> In general, an election shall become irrevocable as of the last day of the enrollment period applicable to it. However, if a Participant incurs an "unforeseeable emergency," as defined in Section 4.7(h), or becomes entitled to receive a hardship distribution pursuant to Treas. Reg. Sec. 1.401(k) - 1(d)(3) after the election otherwise becomes irrevocable, the election shall be cancelled as of the date on which the Participant is determined to have incurred the unforeseeable emergency or becomes eligible to receive the hardship distribution and no further deferrals will be made under it.

# ARTICLE 3

# ACCOUNTS

**3.1.** **Accounts.** RLI shall establish and maintain a separate Account for each Participant. The Account shall be for recordkeeping purposes only and cannot be a trust fund or other segregation of assets for the benefit of the Participant. The balance of each Participant's Account will be maintained in full and fractional shares of RLI Stock.

**3.2.** **Credits to Accounts.** Each Participant's Account shall be credited from time to time as provided in this section.

> **3.2.1.** **Direct Compensation Deferrals.** The amount of each Direct Compensation cash payment or RLI Stock grant (including restricted stock units) which the Participant has elected to defer under the Plan shall be credited to the Participant's Account on, or as soon as administratively practicable after, the date it would otherwise be payable to the Participant. Any cash amount shall be converted to RLI Stock credits, equal to the number of full and fractional shares that could be purchased with such amount on, or as soon as administratively feasible after, the date such amount is credited to the Participant's Account.

> **3.2.2.** **Dividends and Other Adjustments.** The Participant's Account shall be credited with additional RLI Stock credits, equal to the number of full and fractional shares of RLI Stock that could be purchased with any cash dividends which would be payable on the RLI Stock credited to the Participant's Account. For this purposes, the share price on, or as soon as administratively practicable after, the date the dividend is paid will be used. The Account also will be adjusted for any stock split, redemption or similar event, in a manner determined to be reasonable by RLI.

**3.3.** **Charges to Accounts.** As of the date any Plan benefit measured by the Account is paid to the Participant or the Participant's Beneficiary, the Account shall be charged with the amount of such benefit payment.

**ARTICLE 4**

**BENEFITS**

**4.1.**     **Vesting**.  The Participant's Account shall be fully (100%) Vested.

**4.2.**     **Payment of Plan Benefits on Termination of Service - General Rule**.  If the Participant has an Account balance at Termination of Service, RLI shall pay that balance to the Participant in five (5) annual installments, as follows:

(a)   **Time**.  The first installment shall be paid on or about the January 1 following the Year in which the Participant's Termination of Service occurs.  The remaining installments shall be paid on or about each subsequent January 1.

(b)   **Amount**.  The amount of each installment shall be determined using a "fractional" method - by multiplying the Participant's Account balance immediately before the installment payment date by a fraction, the numerator of which is one and the denominator of which is the number of installments remaining (including the installment in question).  The result shall be rounded down to the next lower full share of RLI Stock, except for the final installment, which shall distribute the final shares and pay cash in lieu of any partial share.

**4.3.**     **Changing Payment Elections.**

**4.3.1.**     **General Rule**.  A Participant may elect to change the number of annual installments the Participant receives under the Plan to ten (10) or fifteen (15) installments, subject to the rules below.  Any such election must be made in such manner and in accordance with such rules as may be prescribed for this purpose by RLI (including by means of a voice response or other electronic system under circumstances authorized by RLI).  The installments shall commence on the date specified in Sec. 4.2(a), unless otherwise postponed by this Article 4, and the amount of each installment shall be determined under the fractional method described in Sec. 4.2(b).

**4.3.2.**     **Election upon Initial Plan Enrollment**.  An election to extend the number of installments may be made as part of the Participant's initial enrollment in the Plan, as described in Sec. 2.3.

**4.3.3.**     **Subsequent Election**.  If a Participant did not elect to extend the number of installments upon initial enrollment, or if the Participant wants to further change the number of installments after becoming a Participant, such Participant may elect to change the number of installments in accordance with the following rules:

(a)   The election must be received by RLI in writing and in proper form and must not take effect for at least 12 months from the date on which it is submitted to RLI;

(b)   The election must be submitted to RLI at least 12 months prior to the specified date of distribution; and

(c)   The commencement of installments must be delayed at least five (5) years from the date payments would otherwise commence without this subsequent election.

**4.4.**     **Special Rules**.

**4.4.1.**     **Specified Employee Exception**.  If a Participant becomes an Employee and subsequently has a "separation of service" (within the meaning of Code § 409A (a) (2) (A) (i)), the initial installment (or lump-sum payment, if applicable) shall be delayed to the extent necessary to comply with Code § 409A (a) (2) (B) (i) or any regulations or other guidance issued by the Treasury Department thereunder.

**4.4.2.**     **Cash-Out of Small Amounts**.  Any contrary provision or election notwithstanding, if the Participant's Account balance is less than one hundred thousand dollars ($100,000) as of the date installments are to commence, the Account shall be paid to the Participant in a single lump-sum, as full settlement of all benefits due

under a plan, as provided in rules or regulations under Code § 409A or (ii) exceeds a specified limit, all nonqualified deferred compensation amounts payable to the Participant by RLI and its Affiliates shall be aggregated if and to the extent required under Code § 409A or any regulations or other guidance issued by the Treasury Department thereunder.

**4.5.     Medium of Payments**.  All payments to a Participant shall be made in shares of RLI Stock.  Unless the shares have been registered under the Securities Act of 1933 (the "Act"), are otherwise exempt from the registration requirements of the Act, are the subject of a favorable no action letter issued by the Securities and Exchange Commission, or are the subject of an opinion of counsel acceptable to RLI to the effect that such shares are exempt from the registration requirements of the Act, the transfer of such shares shall be subject to the provisions of Rule 144 of the Act, as the same may be amended from time to time.

**4.6.     Delay in Distributions**.  A payment under the Plan may be delayed by RLI under any of the following circumstances so long as all payments to similarly situated Participants are treated on a reasonably consistent basis:

(a)   RLI reasonably anticipates that if such payment were made as scheduled, RLI's deduction with respect to such payment would not be permitted under Section 162(m) of the Code, provided that the payment is made either during the first calendar year in which RLI reasonably anticipates, or should reasonably anticipate, that if the payment is made during such year, the deduction of such payment will not be barred by application of Section 162(m) or during the period beginning with the date of the Participant's Termination of Employment and ending on the later of the last day of RLI's fiscal year in which the Participant has a Termination of Employment or the 15th day of the third month following the Termination of Employment.

(b)   RLI reasonably anticipates that the making of the payment will violate Federal securities laws or other applicable law, provided that the payment is made at the earliest date at which RLI reasonably anticipates that the making of the payment will not cause such violation.

(c)   Upon such other events as determined by RLI and according to such terms as are consistent with Section 409A or are prescribed by the Commissioner of Internal Revenue.

**4.7     Acceleration of Distributions**.  RLI may, in its discretion, distribute all or a portion of a participant's Accounts at an earlier time and in a different form than specified as otherwise provided in this Article 4, under the circumstances described below:

(a)   As may be necessary to fulfill a Domestic Relations Order.  Distributions pursuant to a Domestic Relations Order shall be made according to administrative procedures established by RLI.

(b)   To the extent reasonably necessary to avoid the violation of ethics laws or conflict of interest laws pursuant to Section 1.409A-3(j) (ii) of the Treasury regulations.

(c)   To pay FICA on amounts deferred under the Plan and the income tax resulting from such payment.

(d)   To pay the amount required to be included in income as a result of the Plan's failure to comply with Section 409A.

(e)   If RLI determines, in its discretion, that it is advisable to liquidate the Plan in connection with a termination of the Plan subject to the requirements of Section 409A.

(f)   As satisfaction of a debt of the Participant to an Affiliate, where such debt is incurred in the ordinary course of the service relationship between the Affiliate and the Participant, the entire amount of the reduction in any Year does not exceed $5,000, and the reduction is made at the same time and in the same amount as the debt otherwise would have been due and collected from the Participant.

(g)   To pay state, local or foreign tax obligations that may arise with respect to amounts deferred under the Plan and the income tax resulting from such payment.

(h) If the Participant has an unforeseeable emergency.  For these purposes an "unforeseeable emergency" is a severe financial hardship to the Participant, resulting from an illness or accident of the Participant, the Participant's spouse, the Beneficiary, or the Participant's dependent (as defined in Section 152, without regard to Section 152(b)(1), (b)(2), and (d)(1)(B) of the Code); loss of the Participant's property due to casualty (including the need to rebuild a home following damage to a home not otherwise covered by insurance); or other similar extraordinary and unforeseeable circumstances arising as a result of events beyond the control of the Participant.  For example, the imminent foreclosure of or eviction from the Participant's primary residence may constitute an unforeseeable emergency.  In addition, the need to pay for medical expenses, including non-refundable deductibles, as well as for the cost of prescription drug medication, may constitute an unforeseeable emergency.  Finally, the need to pay for funeral expenses of a spouse, Beneficiary, or a dependent (as defined in Section 152, without regard to 152(b)(1), (b)(2),  and (d)(1)(B) of the Code) may also constitute an unforeseeable emergency.  Except as otherwise provided in this paragraph (h), the purchase of a home and the payment of college tuition are not unforeseeable emergencies.  Whether a Participant is faced with an unforeseeable emergency permitting a distribution under this paragraph (h) is to be determined based on the relevant facts and circumstances of each case, but, in any case a distribution on account of an unforeseeable emergency may not be made to the extent that such emergency is or may be relieved through reimbursement or compensation from insurance or otherwise, by liquidation of the Participant's assets, to the extent the liquidation of such assets would not cause severe financial hardship, or by cessation of Elective Deferrals.

Distributions because of an unforeseeable emergency must be limited to the amount reasonably necessary to satisfy the emergency need (which may include amounts necessary to pay any Federal, state, local, or foreign income taxes or penalties reasonably anticipated to result from the distribution).  A determination of the amounts reasonably necessary to satisfy the emergency need must take into account any additional compensation that is available due to cancellation of the Participant's election as a result of this paragraph (h).

Notwithstanding anything in this Section 4.7 to the contrary, except for a Participant's election to request a distribution due to an unforeseeable emergency under paragraph (h), above (which the Participant, in the Participant's discretion, may elect to make or not make), RLI shall not provide the Participant with discretion or a direct or indirect election regarding whether a payment is accelerated pursuant to this Section 4.7.

**4.8**     **When a Payment is Deemed to be Made.**  Any payment that is due to be distributed as of a particular date pursuant to the provisions of the Plan, will be deemed to be distributed as of that date if it is distributed on such date or a later date within the same calendar year, or, if later, by the 15th day of the third calendar month following the date, and the Participant is not permitted, directly or indirectly, to designate the calendar year of payment.  Further, a payment will be treated as made on a date if it is made no earlier than 30 days before the date, and the Participant is not permitted, directly or indirectly, to designate the calendar year of payment.  For purposes of the foregoing, if the payment is required to be made during a period of time, the specified date is treated as the first day of the period of time.

## ARTICLE 5

## DEATH BENEFITS

**5.1.**     **Death Benefits**.

**5.1.1.**     **Benefits When Participant Dies Before Commencement of Payments**.  If the Participant dies before installments commence, the Participant's Account balance shall be paid to the Participant's Beneficiary as follows:

(a) If the Participant has made a valid election under Sec. 4.3, payments shall be made in ten (10) or fifteen (15) annual installments, as elected by the Participant.

(b)   Otherwise, payments shall be made in five (5) annual installments.

The first installment shall be paid on the January 1 following the Year in which the Participant's death occurs.  The remaining installments shall be paid on each subsequent January 1.  The amount of each installment shall be determined using the "fractional" method described in Sec. 4.2(b).

**5.1.2.**   **Benefits When Participant Dies After Commencement of Payments**.  If the Participant dies after installments commence and the Participant has an Account balance at death, the remaining Account balance shall be paid to the Participant's Beneficiary in the same manner as if the Participant were still living.

**5.1.3.**   **Medium of Payments**.  All payments to a Beneficiary shall be made in shares of RLI Stock.

**5.1.4.**   **Cash-Out of Small Amounts**.  Any contrary provision or election notwithstanding, if the amount payable to the Beneficiary is less than one hundred thousand dollars ($100,000) as of the date installments are to commence, the benefit shall be paid to the Beneficiary in a single lump-sum, as full settlement of all benefits due under the Plan, subject, however, to any limitation on such cash-out under Code § 409A or any regulations or other guidance issued by the Treasury Department thereunder.

**5.2.**   **Designation of Beneficiary**.

**5.2.1.**   **Persons Eligible to Designate**.  Any Participant may designate a Beneficiary to receive any amount payable under the Plan as a result of the Participant's death, provided that the Beneficiary survives the Participant.  The Beneficiary may be one or more persons, natural or otherwise.  By way of illustration, but not by way of limitation, the Beneficiary may be an individual, trustee, executor, or administrator.  A Participant may also change or revoke a designation previously made, without the consent of any Beneficiary named therein.

**5.2.2.**   **Form and Method of Designation**.  Any designation or a revocation of a prior designation of Beneficiary shall be in writing on a form acceptable to RLI and shall be filed with RLI.  RLI and all other parties involved in making payment to a Beneficiary may rely on the latest Beneficiary designation on file with RLI at the time of payment or may make payment pursuant to Sec. 5.2.3 if an effective designation is not on file, shall be fully protected in doing so, and shall have no liability whatsoever to any person making claim for such payment under a subsequently filed designation of Beneficiary or for any other reason.

**5.2.3.**   **No Effective Designation**.  If there is not on file with RLI an effective designation of Beneficiary by a deceased Participant, the Beneficiary shall be the person or persons surviving the Participant in the first of the following classes in which there is a survivor, share and share alike:

**(a)**   The Participant's spouse.  (A "spouse" is a person of the opposite sex to whom the    Participant is legally married, including a common-law spouse if the marriage was entered into in a state that recognizes common-law marriages and RLI has received acceptable proof and/or certification of common-law married status.)

**(b)**   The Participant's then living descendants, per stirpes.

**(c)**   The individuals entitled to inherit the Participant's property under the law of the state in which the Participant resides immediately before the Participant's death, in the proportions determined under such law.

Determination of the identity of the Beneficiary in each case shall be made by RLI.

**5.2.4.**   **Successor Beneficiary**.  If a Beneficiary who survives the Participant subsequently dies before receiving the complete payment to which the Beneficiary was entitled, the successor Beneficiary, determined in accordance with the provisions of this section, shall be entitled to the payments remaining.  The successor Beneficiary

shall be paid to the surviving members of the first of the following classes of which there is a survivor, share and share alike:

(a) The Beneficiary's spouse. (A "spouse" is a person of the opposite sex to whom the Beneficiary is legally married, including a common-law spouse if the marriage was entered into in a state that recognizes common-law marriages and RLI has received acceptable proof and/or certification of common-law married status.)

(b) The Beneficiary's then living descendants, per stirpes.

(c) The individuals entitled to inherit the Beneficiary's property under the law of the state in which the Beneficiary resides immediately before the Beneficiary's death, in the proportions determined under such law.

## ARTICLE 6

### PAYMENT PROCEDURES

**6.1.     Application for Benefits**.  Benefits shall be paid to Participants automatically (without a written request) at the time and in the manner specified in the Plan.  Benefits shall be paid to a Beneficiary upon RLI's receipt of a written request for the benefits, including appropriate proof of the Participant's death and the Beneficiary's identity and right to payment.

**6.2.     Deferral of Payment**.  If there is a dispute regarding a Plan benefit, RLI, in its sole discretion, may defer payment of the benefit until the dispute has been resolved.

## ARTICLE 7

### ADMINISTRATION

**7.1.     Administrator**.  RLI shall be the administrator of the Plan.  RLI shall control and manage the administration and operation of the Plan and shall make all decisions and determinations incident thereto.  Except with respect to the ordinary day-to-day administration of the Plan, action on behalf of RLI must be taken by one of the following:

(a) The Board; or

(b) The Nominating/Corporate Governance Committee of the Board.

**7.1.1.     Delegation**.  The ordinary day-to-day administration of the Plan may be delegated by the chief executive officer of RLI to an individual or a committee.  Such individual or committee shall have the authority to delegate or redelegate to one or more persons, jointly or severally, such functions assigned to such individual or committee as such individual or committee may from time to time deem advisable.

**7.1.2.     Automatic Removal**.  If any individual or committee member to whom responsibility under the Plan is allocated is a director, officer or employee of RLI or an Affiliate when responsibility is so allocated, then such individual shall be automatically removed as a member of a committee at the earliest time such individual ceases to be a director, officer or employee of RLI or an Affiliate.  This removal shall occur automatically and without any requirement for action by RLI or any notice to the individual so removed.

**7.1.3.     Conflict of Interest**.  If any individual or committee member to whom responsibility under the Plan is allocated is also a Participant or Beneficiary, such individual shall have no authority as such member with respect to any matter specifically affecting such Participant or Beneficiary's individual interest hereunder (as distinguished from the interests of all Participants and Beneficiaries or a broad class of Participants and Beneficiaries), all such

authorize its selection by employee or other Committee member, excluding such Participant or Beneficiary, and such Participant or Beneficiary shall act only in an individual capacity in connection with any such matter.

**7.1.4.    Binding Effect**.  The determination of the Board or the Nominating/Corporate Governance Committee of the Board in any matter within its authority shall be binding and conclusive upon RLI and all persons having any right or benefit under the Plan.

**7.1.5.    Third-Party Service Providers**.  RLI may from time to time appoint or contract with an administrator, recordkeeper or other third-party service provider for the Plan.  Any such administrator, recordkeeper or other third-party service provider will serve in a nondiscretionary capacity and will act in accordance with directions given and procedures established by RLI.

**7.2.    Benefits Not Transferable.**  No Participant or Beneficiary shall have the power to transmit, alienate, dispose of, pledge or encumber any benefit payable under the Plan before its actual payment to the Participant or Beneficiary.  Any such effort by a Participant or Beneficiary to convey any interest in the Plan shall not be given effect under the Plan.  No benefit payable under the Plan shall be subject to attachment, garnishment, execution following judgment or other legal process before its actual payment to the Participant or Beneficiary.

**7.3.    Benefits Not Secured**.  The rights of each Participant and Beneficiary shall be solely those of an unsecured, general creditor of RLI.  No Participant or Beneficiary shall have any lien, prior claim or other security interest in any property of RLI.

**7.4.    RLI's Obligations**.  RLI shall provide the benefits under the Plan.  RLI's obligation may be satisfied by distributions from a trust fund created and maintained by RLI, in its sole discretion, for such purpose.  However, the assets of any such trust fund shall be subject to claims by the general creditors of RLI in the event RLI is (i) unable to pay its debts as they become due, or (ii) is subject to a pending proceeding as a debtor under the United States Bankruptcy Code.

**7.5.    Withholding Taxes**.  RLI shall have the right to withhold (and transmit to the proper taxing authority) such federal, state or local taxes as it may be required to withhold by applicable laws.  Such taxes may be withheld from any benefits due under the Plan or from any other compensation to which the Participant is entitled from RLI and its Affiliates.

**7.6.    Service of Process**.  The chief executive officer of RLI is designated as the appropriate and exclusive agent for the receipt of service of process directed to the Plan in any legal proceeding, including arbitration, involving the Plan.

**7.7.    Limitation on Liability**.  Neither RLI's officers nor any member of its Board nor any individual or committee to whom RLI delegates responsibility under the Plan in any way secures or guarantees the payment of any benefit or amount which may become due and payable hereunder to or with respect to any Participant.  Each Participant and other person entitled at any time to payments hereunder shall look solely to the assets of RLI for such payments as an unsecured, general creditor.  After benefits have been paid to or with respect to a Participant and such payment purports to cover in full the benefit hereunder, such former Participant or other person(s), as the case may be, shall have no further right or interest in the other assets of RLI in connection with the Plan.  Neither RLI nor any of its officers nor any member of its Board nor any individual or committee to whom RLI delegates responsibility under the Plan shall be under any liability or responsibility for failure to effect any of the objectives or purposes of the Plan by reason of the insolvency of RLI.

## ARTICLE 8

## AMENDMENT AND TERMINATION

**8.1.    Amendment**.  RLI reserves the power to amend the Plan either prospectively or retroactively or both, in any respect, by action of its Board; *provided that*, no amendment shall be effective to reduce or divest benefits payable with respect to the Account of any Participant or Beneficiary without consent.  No amendment of the Plan shall be

effective as a waiver of any such provision on any other occasion. No oral representation concerning the interpretation or effect of the Plan shall be effective to amend the Plan.

**8.2.  Termination**.  RLI reserves the right to terminate the Plan at any time by action of its Board; *provided that*, the termination of the Plan shall not reduce or divest benefits payable with respect to the Account of any Participant or Beneficiary or negate the Participant's or Beneficiary's rights with respect to such benefits.  Any such termination will be done in accordance with the requirements of Section 409A.

**ARTICLE 9**

**MISCELLANEOUS**

**9.1.  Effect on Other Plans**.  This Plan shall not alter, enlarge or diminish any person's rights or obligations under any other benefit plan maintained by RLI or any Affiliate.

**9.2.  Effect on Service**.  Neither the terms of this Plan nor the benefits hereunder nor the continuance thereof shall be a term of the service of any Director.  RLI shall not be obliged to continue the Plan.  The terms of this Plan shall not give any Director the right to continue serving as a member of the Board, nor shall it create any obligation on the part of the Board to nominate any Director for reelection by RLI's stockholders.

**9.3.  Disqualification.**  Notwithstanding any other provision of the Plan or any designation made under the Plan, any individual who feloniously and intentionally kills a Participant shall be deemed for all purposes of the Plan and all elections and designations made under the Plan to have died before such Participant.  A final judgment of conviction of felonious and intentional killing is conclusive for this purpose.  In the absence of a conviction of felonious and intentional killing, RLI shall determine whether the killing was felonious and intentional for this purpose.

**9.4.  Rules of Document Construction**.  Whenever appropriate, words used herein in the singular may be read in the plural, or words used herein in the plural may be read in the singular; and the words "hereof," "herein" or "hereunder" or other similar compounds of the word "here" shall mean and refer to the entire Plan and not to any particular article, section or paragraph of the Plan unless the context clearly indicates to the contrary.  The titles given to the various articles and sections of the Plan are inserted for convenience of reference only and are not part of the Plan, and they shall not be considered in determining the purpose, meaning or intent of any provision hereof.  Written notification under the Plan shall include such other methods (for example, facsimile or e-mail) as RLI, in its sole discretion, may authorize from time to time.

**9.5.  References to Laws.**  Any reference in the Plan to a statute shall be considered also to mean and refer to the applicable regulations for that statute. Any reference in the Plan to a statute or regulation shall be considered also to mean and refer to any subsequent amendment or replacement of that statute or regulation.

**9.6.  Choice of Law**.  The Plan has been executed in the State of Illinois and has been drawn in conformity to the laws of that state and shall, except to the extent that federal law is controlling, be construed and enforced in accordance with the laws of the State of Illinois (without regard to its conflict of law principles).

**9.7.  Binding Effect**.  The Plan shall be binding upon and inure to the benefit of the successors and assigns of RLI, and the Beneficiaries, personal representatives and heirs of the Participant.

**IN WITNESS WHEREOF**, RLI has cause the Plan to be executed by its duly authorized officers as of the 3rd day of May, 2018.

**RLI Corp.**

By: Jonathan E. Michael

Its: Chairman & CEO

And

By: Jean M. Stephenson

Its: Vice President, Corporate Secretary

---

(Back To Top)

# Section 3: EX-31.1 (EX-31.1)

**Exhibit 31.1**

**CERTIFICATION**

Chief Executive Officer Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, Jonathan E. Michael, certify that:

I have reviewed this quarterly report on Form 10-Q of RLI Corp.;

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the

Date:          July 20, 2018

/s/ Jonathan E. Michael
_____

Jonathan E. Michael
Chairman & CEO

---

([Back To Top](#))

# Section 4: EX-31.2 (EX-31.2)

**Exhibit 31.2**

## CERTIFICATION

Chief Financial Officer Certification pursuant to Section 302 of the Sarbanes-Oxley Act of 2002

I, Thomas L. Brown, certify that:

I have reviewed this quarterly report on Form 10-Q of RLI Corp.;

Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of  the registrant's board of directors (or persons performing the equivalent functions):

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:          July 20, 2018

/s/ Thomas L. Brown
_____

Thomas L. Brown
SVP, Chief Financial Officer

---

(Back To Top)

# Section 5: EX-32.1 (EX-32.1)

**Exhibit 32.1**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of RLI Corp. (the "Company") on Form 10-Q for the period ending June 30, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Jonathan E. Michael, Chief Executive Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

     (1)  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

     (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Jonathan E. Michael

---

Jonathan E. Michael
Chairman & CEO
July 20, 2018

---

(Back To Top)

# Section 6: EX-32.2 (EX-32.2)

**Exhibit 32.2**

**CERTIFICATION PURSUANT TO**
**18 U.S.C. SECTION 1350,**
**AS ADOPTED PURSUANT TO**
**SECTION 906 OF THE SARBANES-OXLEY ACT OF 2002**

In connection with the Quarterly Report of RLI Corp. (the "Company") on Form 10-Q for the period ending June 30, 2018 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, Thomas L. Brown, Chief Financial Officer of the Company, certify, pursuant to 18 U.S.C. § 1350, as adopted pursuant to § 906 of the Sarbanes-Oxley Act of 2002, that:

     (1)  The Report fully complies with the requirements of section 13(a) or 15(d) of the Securities Exchange Act of 1934, and

     (2)  The information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company.

/s/ Thomas L. Brown

---

Thomas L. Brown
SVP, Chief Financial Officer
July 20, 2018

(Back To Top)

**EXHIBIT D**



Page 1

# Delaware

### The First State

I, JEFFREY W. BULLOCK, SECRETARY OF STATE OF THE STATE OF DELAWARE, DO HEREBY CERTIFY "RLI CORP." IS DULY INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE AND IS IN GOOD STANDING AND HAS A LEGAL CORPORATE EXISTENCE SO FAR AS THE RECORDS OF THIS OFFICE SHOW, AS OF THE SIXTEENTH DAY OF AUGUST, A.D. 2018.

AND I DO HEREBY FURTHER CERTIFY THAT THE ANNUAL REPORTS HAVE BEEN FILED TO DATE.

AND I DO HEREBY FURTHER CERTIFY THAT THE FRANCHISE TAXES HAVE BEEN PAID TO DATE.

Jeffrey W. Bullock, Secretary of State

6633589  8300

SR# 20186201808

You may verify this certificate online at corp.delaware.gov/authver.shtml

Authentication: 203258175

Date: 08-16-18

**EXHIBIT E**



**TV / PERINJ**
**Transmittal Number: 18112508**
**Date Processed: 05/01/2018**

# Notice of Service of Process

| | |
|---|---|
| **Primary Contact:** | Paula B Christ<br>The Goodyear Tire & Rubber Company<br>200 Innovation Way<br>Akron, OH 44316-0001 |

| | |
|---|---|
| **Entity:** | The Goodyear Tire & Rubber Company<br>Entity ID Number  2385176 |
| **Entity Served:** | The Goodyear Tire & Rubber Co. |
| **Title of Action:** | RLI Corp (Jack E Crans) vs. The Good Year Tire & Rubber Co |
| **Document(s) Type:** | Representation Letter - Demand for Payment |
| **Nature of Action:** | Property |
| **Case/Reference No:** | 11704 |
| **Jurisdiction Served:** | Idaho |
| **Date Served on CSC:** | 04/30/2018 |
| **Answer or Appearance Due:** | 10 Days |
| **Originally Served On:** | CSC |
| **How Served:** | Regular Mail |
| **Sender Information:** | Louis V Spiker<br>208-345-9100 |

Information contained on this transmittal form is for record keeping, notification and forwarding the attached document(s). It does not constitute a legal opinion. The recipient is responsible for interpreting the documents and taking appropriate action.

**To avoid potential delay, please do not send your response to CSC**

251 Little Falls Drive, Wilmington, Delaware 19808-1674   (888) 690-2882   |   sop@cscglobal.com

Richard J. "Tug" Worst
John O. Fitzgerald, II
Timothy J. Stover
David W. Gadd
Louis V. Spiker
Janine P. Reynard

April 26, 2018

*Attorneys at Law*

**WILSON & McCOLL**
Jeffrey M. Wilson
Brian F. McColl

*Of Counsel*

The Goodyear Tire & Rubber Co.
c/o Corporation Service Company, Registered Agent
12550 W Explorer Dr, Ste. 100
Boise, ID 83713

> Re:   **The Goodyear Tire & Rubber Co.**
> **RLI Corp. Claim No. 11704**
> **Insured Jack E. Crans**

Dear Mr. Kramer:

Our firm represents RLI Corp., a property and casualty insurer with a subrogated interest under its policy of insurance issued to Jack E. Crans ("Insured"). As we understand the facts of the matter, on July 19, 2016, the Insured and a passenger were involved in a single-vehicle accident near Idaho Falls, Idaho, when the right front tire blew out on a 2011 Holiday Rambler M-43D Scepter Motor Home (hereinafter, "RV") the Insured was driving on Interstate 15. When the tire blew out, the Insured lost control of the RV and drove into an embankment. The RV was a total loss and both the driver and passenger suffered injuries in the accident. The right front tire at issue was a Goodyear G670RV, size 295/80R22.5, DOT Code DANU 2CAW 2911 ("Tire"). An engineer inspected the Tire and determined that the Tire failed due to manufacturing defects, including but not limited to poor to no adhesion of the liner to any rubber on the inside of the Tire, which resulted in a catastrophic failure of the Tire.

RLI Corp. has paid the sum of $242,147.44 as a result of the accident, pursuant to a policy of insurance issued to the Insured. Payments made under the policy of insurance include: towing charges of $7,179.50 to Hendrickson Towing Inc.; lien payoff of $229,707.94 to Solarity Credit Union; storage fees of $4,260.00 to Insurance Auto Auctions Inc., and a deductible reimbursement of $1,000.00 to the Insured.

Thus, formal demand is hereby made for payment of the sum of $242,147.44. If payment of this sum is not made within ten (10) days from the date of this letter, we have been authorized to instigate legal proceedings in order to reduce this obligation to judgment and thereafter take the necessary steps to enforce such judgment.

*Please direct all correspondence to our Boise office at the address noted below*

Boise Office
3858 North Garden Center Way, Suite 200, Boise, ID  83703
P.O. Box 1544, Boise, ID 83701
Phone: (208) 345-9100 | Facsimile: (208) 384-0442

Twin Falls Office:
905 Shoshone Street North, Twin Falls, ID 83301
P.O. Box 1428, Twin Falls, ID 83303-1428
Phone: (208)736-9900 | Facsimile: (208) 736-9929
www.magicvalleylaw.com

The Goodyear Tire & Rubber Company
April 26, 2018
Page 2

If you choose to make payment as demanded, the same is to be made to RLI Corp. in care of this office.  Your prompt response is expected.

Yours very truly,

Louis V. Spiker

cc:    Lori A. Skillman via email lori_skillman@goodyear.com
       client



WORST, FITZGERALD
& STOVER, P.L.L.C.

P.O. Box 1544
Boise, ID 83701

ADDRESS SERVICE REQUESTED

The Goodyear Tire & Rubber Co.
c/o Corporation Service Company, Registered
Agent
12550 W Explorer Dr, Ste. 100
Boise, ID 83713

US POSTAGE PITNEY BOWES

$ 000.470

02  1P
0000311558  APR 26 2018
MAILED FROM ZIP CODE 83702